WYMAN, COMMISSIONER OF NEW YORK
DEPARTMENT OF SOCIAL SERVICES,
ET AL. *v.* JAMES

No. 69.   Argued October 20, 1970—Decided January 12, 1971

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, and STEWART, JJ., and WHITE, J. (except for Part IV) joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 326. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 338.

*Brenda Soloff,* Assistant Attorney General of New York, argued the cause for appellant Wyman. With her on the brief were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General, for appellant Wyman, and *J. Lee Rankin* for appellant Goldberg, Commissioner of Social Services of the City of New York.

*Jonathan Weiss* argued the cause for appellee. With him on the brief was *David Gilman.*

Briefs of *amici curiae* urging affirmance were filed by *Stephen F. Gordon* and *Ernest Fleischman* for the Social Service Employees Union Local 371, AFSCME, AFL–CIO, and by *Lois P. Sheinfeld* for the Legal Aid Society of San Mateo County.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This appeal presents the issue whether a beneficiary of the program for Aid to Families with Dependent Children (AFDC)[1] may refuse a home visit by the caseworker without risking the termination of benefits.

---

[1] In *Goldberg* v. *Kelly,* 397 U. S. 254, 256 n. 1 (1970), the Court observed that AFDC is a categorical assistance program supported

The New York State and City social services commissioners appeal from a judgment and decree of a divided three-judge District Court holding invalid and unconstitutional in application § 134 of the New York Social Services Law,[2] § 175 of the New York Policies Governing

---

by federal grants-in-aid but administered by the States according to regulations of the Secretary of Health, Education, and Welfare. See New York Social Services Law §§ 343–362 (1966 and Supp. 1969–1970). Aspects of AFDC have been considered in *King* v. *Smith*, 392 U. S. 309 (1968); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969); *Goldberg* v. *Kelly, supra; Rosado* v. *Wyman*, 397 U. S. 397 (1970); and *Dandridge* v. *Williams*, 397 U. S. 471 (1970).

[2] "§ 134. Supervision.

"The public welfare officials responsible . . . for investigating any application for public assistance and care, shall maintain close contact with persons granted public assistance and care. Such persons shall be visited as frequently as is provided by the rules of the board and/or regulations of the department or required by the circumstances of the case, in order that any treatment or service tending to restore such persons to a condition of self-support and to relieve their distress may be rendered and in order that assistance or care may be given only in such amount and as long as necessary. . . . . The circumstances of a person receiving continued care shall be reinvestigated as frequently as the rules of the board or regulations of the department may require."

Section 134–a, as added by Laws 1967, c. 183, effective April 1, 1967, provides:

"In accordance with regulations of the department, any investigation or reinvestigation of eligibility . . . shall be limited to those factors reasonably necessary to insure that expenditures shall be in accord with applicable provisions of this chapter and the rules of the board and regulations of the department and shall be conducted in such manner so as not to violate any civil right of the applicant or recipient. In making such investigation or reinvestigation, sources of information, other than public records, shall be consulted only with the permission of the applicant or recipient. However, if such permission is not granted by the applicant or recipient, the appropriate public welfare official may deny, suspend or discontinue public assistance or care until such time as he may be satisfied that such applicant or recipient is eligible therefor."

the Administration of Public Assistance,[3] and §§ 351.10 and 351.21 of Title 18 of the New York Code of Rules and Regulations,[4] and granting injunctive relief. *James v. Goldberg,* 303 F. Supp. 935 (SDNY 1969). This Court noted probable jurisdiction but, by a divided vote, denied a requested stay. 397 U. S. 904.

The District Court majority held that a mother receiving AFDC relief may refuse, without forfeiting her right to that relief, the periodic home visit which the cited New York statutes and regulations prescribe as a condition for the continuance of assistance under the program. The beneficiary's thesis, and that of the Dis-

---

[3] "Mandatory visits must be made in accordance with law that requires that persons be visited at least once every three months if they are receiving . . . Aid to Dependent Children . . . ."

[4] "Section 351.10. *Required home visits and contacts.* Social investigation as defined and described . . . shall be made of each application or reapplication for public assistance or care as the basis for determination of initial eligibility.

"a. Determination of initial eligibility shall include contact with the applicant and at least one home visit which shall be made promptly in accordance with agency policy. . . ."

"Section 351.21. *Required contacts.* Contacts with recipients and collateral sources shall be adequate as to content and frequency and shall include home visits, office interviews, correspondence, reports on resources and other necessary documentation."

Section 369.2 of Title 18 provides in part: "(c) *Welfare of child or minor.* A child or minor shall be considered to be eligible for ADC if his home situation is one in which his physical, mental and moral well-being will be safeguarded and his religious faith preserved and protected. (1) In determining the ability of a parent or relative to care for the child so that this purpose is achieved, the home shall be judged by the same standards as are applied to self-maintaining families in the community. When, at the time of application, a home does not meet the usual standards of health and decency but the welfare of the child is not endangered, ADC shall be granted and defined services provided in an effort to improve the situation. Where appropriate, consultation or direct service shall be requested from child welfare."

trict Court majority, is that home visitation is a search and, when not consented to or when not supported by a warrant based on próbable cause, violates the beneficiary's Fourth and Fourteenth Amendment rights.

Judge McLean, in dissent, thought it unrealistic to regard the home visit as a search; felt that the requirement of a search warrant to issue only upon a showing of probable cause would make the AFDC program "in effect another criminal statute" and would "introduce a hostile arm's length element into the relationship" between worker and mother, "a relationship which can be effective only when it is based upon mutual confidence and trust"; and concluded that the majority's holding struck "a damaging blow" to an important social welfare program. 303 F. Supp., at 946.

## I

The case comes to us on the pleadings and supporting affidavits and without the benefit of testimony which an extended hearing would have provided. The pertinent facts, however, are not in dispute.

Plaintiff Barbara James is the mother of a son, Maurice, who was born in May 1967. They reside in New York City. Mrs. James first applied for AFDC assistance shortly before Maurice's birth. A caseworker made a visit to her apartment at that time without objection. The assistance was authorized.

Two years later, on May 8, 1969, a caseworker wrote Mrs. James that she would visit her home on May 14. Upon receipt of this advice, Mrs. James telephoned the worker that, although she was willing to supply information "reasonable and relevant" to her need for public assistance, any discussion was not to take place at her home. The worker told Mrs. James that she was required by law to visit in her home and that refusal to

permit the visit would result in the termination of assistance. Permission was still denied.

On May 13 the City Department of Social Services sent Mrs. James a notice of intent to discontinue assistance because of the visitation refusal. The notice advised the beneficiary of her right to a hearing before a review officer. The hearing was requested and was held on May 27. Mrs. James appeared with an attorney at that hearing.[5] They continued to refuse permission for a worker to visit the James home, but again expressed willingness to cooperate and to permit visits elsewhere. The review officer ruled that the refusal was a proper ground for the termination of assistance. His written decision stated:

> "The home visit which Mrs. James refuses to permit is for the purpose of determining if there are any changes in her situation that might affect her eligibility to continue to receive Public Assistance, or that might affect the amount of such assistance, and to see if there are any social services which the Department of Social Services can provide to the family."

A notice of termination issued on June 2.

Thereupon, without seeking a hearing at the state level, Mrs. James, individually and on behalf of Maurice, and purporting to act on behalf of all other persons similarly situated, instituted the present civil rights suit under 42 U. S. C. § 1983. She alleged the denial of rights guaranteed to her under the First, Third, Fourth, Fifth, Sixth, Ninth, Tenth, and Fourteenth Amendments, and under Subchapters IV and XVI of the Social Security Act and regulations issued thereunder. She further alleged that

---

[5] No issue of procedural due process is raised in this case. Cf. *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), and *Wheeler* v. *Montgomery*, 397 U. S. 280 (1970).

she and her son have no income, resources, or support other than the benefits received under the AFDC program. She asked for declaratory and injunctive relief. A temporary restraining order was issued on June 13, *James* v. *Goldberg,* 302 F. Supp. 478 (SDNY 1969), and the three-judge District Court was convened.

## II

The federal aspects of the AFDC program deserve mention. They are provided for in Subchapter IV, Part A, of the Social Security Act of 1935, 49 Stat. 627, as amended, 42 U. S. C. §§ 601–610 (1964 ed. and Supp. V). Section 401 of the Act, 42 U. S. C. § 601 (1964 ed., Supp. V), specifies its purpose, namely, "encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services . . . to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life . . . ." The same section authorizes the federal appropriation for payments to States that qualify. Section 402, 42 U. S. C. § 602 (1964 ed., Supp. V), provides that a state plan, among other things, must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for aid to families with dependent children is denied or is not acted upon with reasonable promptness"; must "provide that the State agency will make such reports . . . as the Secretary [of Health, Education, and Welfare] may from time to time require"; must "provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid"; and must "provide that where the State agency has reason to believe that the home in which a relative and child receiving aid reside is unsuitable for the child because of the neglect, abuse, or exploitation of

316

such child it shall bring such condition to the attention of the appropriate court or law enforcement agencies in the State . . . ." Section 405, 42 U. S. C. § 605, provides that .

> "Whenever the State agency has reason to believe that any payments of aid . . . made with respect to a child are not being or may not be used in the best interests of the child, the State agency may provide for such counseling and guidance services with respect to the use of such payments and the management of other funds by the relative . . . in order to assure use of such payments in the best interests of such child, and may provide for advising such relative that continued failure to so use such payments will result in substitution therefor of protective payments . . . or in seeking the appointment of a guardian . . . or in the imposition of criminal or civil penalties . . . ."

### III

When a case involves a home and some type of official intrusion into that home, as this case appears to do, an immediate and natural reaction is one of concern about Fourth Amendment rights and the protection which that Amendment is intended to afford. Its emphasis indeed is upon one of the most precious aspects of personal security in the home: "The right of the people to be secure in their persons, houses, papers, and effects . . . ." This Court has characterized that right as "basic to a free society." *Wolf* v. *Colorado*, 338 U. S. 25, 27 (1949); *Camara* v. *Municipal Court*, 387 U. S. 523, 528 (1967). And over the years the Court consistently has been most protective of the privacy of the dwelling. See, for example, *Boyd* v. *United States*, 116 U. S. 616, 626–630 (1886); *Mapp* v. *Ohio*, 367 U. S. 643 (1961); *Chimel* v. *California*, 395 U. S. 752 (1969); *Vale* v. *Louisiana*, 399

U. S. 30 (1970).  In *Camara* MR. JUSTICE WHITE, after noting that the "translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task," went on to observe,

> "Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." 387 U. S., at 528–529.

He pointed out, too, that one's Fourth Amendment protection subsists apart from his being suspected of criminal behavior.  387 U. S., at 530.

## IV

This natural and quite proper protective attitude, however, is not a factor in this case, for the seemingly obvious and simple reason that we are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term. It is true that the governing statute and regulations appear to make mandatory the initial home visit and the subsequent periodic "contacts" (which may include home visits) for the inception and continuance of aid. It is also true that the caseworker's posture in the home visit is perhaps, in a sense, both rehabilitative and investigative.  But this latter aspect, we think, is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context.  We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act.  If consent to the visitation is withheld, no visitation takes

place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.

## V

If however, we were to assume that a caseworker's home visit, before or subsequent to the beneficiary's initial qualification for benefits, somehow (perhaps because the average beneficiary might feel she is in no position to refuse consent to the visit), and despite its interview nature, does possess some of the characteristics of a search in the traditional sense, we nevertheless conclude that the visit does not fall within the Fourth Amendment's proscription. This is because it does not descend to the level of unreasonableness. It is unreasonableness which is the Fourth Amendment's standard. *Terry* v. *Ohio*, 392 U. S. 1, 9 (1968); *Elkins* v. *United States*, 364 U. S. 206, 222 (1960). And Mr. Chief Justice Warren observed in *Terry* that "the specific content and incidents of this right must be shaped by the context in which it is asserted." 392 U. S., at 9.

There are a number of factors that compel us to conclude that the home visit proposed for Mrs. James is not unreasonable:

1. The public's interest in this particular segment of the area of assistance to the unfortunate is protection and aid for the dependent child whose family requires such aid for that child. The focus is on the *child* and, further, it is on the child who is *dependent*. There is no more worthy object of the public's concern. The dependent child's needs are paramount, and only with hesitancy would we relegate those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights.

2. The agency, with tax funds provided from federal as well as from state sources, is fulfilling a public trust. The State, working through its qualified welfare agency,

has appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit; from the aid it dispenses. Surely it is not unreasonable, in the Fourth Amendment sense or in any other sense of that term, that the State have at its command a gentle means, of limited extent and of practical and considerate application, of achieving that assurance.

3. One who dispenses purely private charity naturally has an interest in and expects to know how his charitable funds are utilized and put to work. The public, when it is the provider, rightly expects the same. It might well expect more, because of the trust aspect of public funds, and the recipient, as well as the caseworker, has not only an interest but an obligation.

4. The emphasis of the New York statutes and regulations is upon the home, upon "close contact" with the beneficiary, upon restoring the aid recipient "to a condition of self-support," and upon the relief of his distress. The federal emphasis is no different. It is upon "assistance and rehabilitation," upon maintaining and strengthening family life, and upon "maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . ." 42 U. S. C. § 601 (1964 ed., Supp. V); *Dandridge* v. *Williams,* 397 U. S. 471, 479 (1970), and *id.,* at 510 (MARSHALL, J., dissenting). It requires cooperation from the state agency upon specified standards and in specified ways. And it is concerned about any possible exploitation of the child.

5. The home visit, it is true, is not required by federal statute or regulation.[6] But it has been noted that the

---

[6] The federal regulations require only periodic redeterminations of eligibility. HEW Handbook of Public Assistance Administration, pt. IV, § 2200 (d). But they also require verification of eligibility by making field investigations "including home visits" in a selected sample of cases. Pt. II, § 6200 (a) (3).

visit is "the heart of welfare administration"; that it affords "a personal, rehabilitative orientation, unlike that of most federal programs"; and that the "more pronounced service orientation" effected by Congress with the 1956 amendments to the Social Security Act "gave redoubled importance to the practice of home visiting." Note, Rehabilitation, Investigation and the Welfare Home Visit, 79 Yale L. J. 746, 748 (1970). The home visit is an established routine in States besides New York.[7]

6. The means employed by the New York agency are significant. Mrs. James received written notice several days in advance of the intended home visit.[8] The date

---

[7] See, e. g., Ala., Manual for Administration of Public Assistance, pt. I–8 (B) (1968 rev.); Ariz., Regulations promulgated pursuant to Rev. Stat. Ann. § 46–203 (1956), Reg. 3–203.6 (1968); Ark. Stat. Ann. § 83–131 (1960); Cal. State Dept. of Social Welfare Handbook, C–012.50 (1964); Colo. Rev. Stat. Ann. § 119–9–1 et seq. (Supp. 1967), as amended, Laws 1969, c. 279; Fla. Public Assistance c. 100; Ga. Division of Social Administration—Public Assistance Manual, pt. III, § V (D) (2), pt. VIII (A) (1) (b) (1969); Ill. Rev. Stat., c. 23, § 4–7 (1967); Ind. Ann. Stat. § 52–1247 (1964), Dept. Pub. Welfare, Rules & Regs., Reg. 2–403 (1965); Mich. Public Assistance Manual, Item 243 (3) (F) (Rev.) (1967); Miss. Code Ann. § 7177 (1942) (Laws of 1940, c. 294); Mo. Public Assistance Manual, Dept. of Welfare, § III (1969); Nebraska, State Plan and Manual Regulations, pt. IX, §§ 5760, 5771; N. J., Manual of Administration, Division of Public Welfare, pt. II, §§ 2120, 2122 (1969); N. M. Stat. Ann. § 13–1–13 (1953), Health and Social Services Dept. Manual, §§ 211.5, 272.11; S. C. Dept. of Public Welfare Manual, Vol. IV (D) (2); S. D. Comp. Laws Ann. § 28–7–7 (1967) (formerly S. D. Code § 55.3805); Tenn. Code Ann. § 14–309 (1955), Public Assistance Manual, Vol. II, p. 212 (1968 rev.); Wis. Stat. § 49.19 (2) (1967).

[8] It is true that the record contains 12 affidavits, all essentially identical, of aid recipients (other than Mrs. James) which recite that a caseworker "most often" comes without notice; that when he does, the plans the recipient had for that time cannot be carried out; that the visit is "very embarrassing to me if the caseworker comes when I have company"; and that the caseworker "sometimes asks very personal questions" in front of children.

was specified. Section 134–a of the New York Social Services Law, effective April 1, 1967, and set forth in n. 2, *supra,* sets the tone. Privacy is emphasized. The applicant-recipient is made the primary source of information as to eligibility. Outside informational sources, other than public records, are to be consulted only with the beneficiary's consent. Forcible entry or entry under false pretenses or visitation outside working hours or snooping in the home are forbidden. HEW Handbook of Public Assistance Administration, pt. IV, §§ 2200 (a) and 2300; 18 NYCRR §§ 351.1, 351.6, and 351.7. All this minimizes any "burden" upon the homeowner's right against unreasonable intrusion.

7. Mrs. James, in fact, on this record presents no specific complaint of any unreasonable intrusion of her home and nothing that supports an inference that the desired home visit had as its purpose the obtaining of information as to criminal activity. She complains of no proposed visitation at an awkward or retirement hour. She suggests no forcible entry. She refers to no snooping. She describes no impolite or reprehensible conduct of any kind. She alleges only, in general and nonspecific terms, that on previous visits and, on information and belief, on visitation at the home of other aid recipients, "questions concerning personal relationships, beliefs and behavior are raised and pressed which are unnecessary for a determination of continuing eligibility." Paradoxically, this same complaint could be made of a conference held elsewhere than in the home, and yet this is what is sought by Mrs. James. The same complaint could be made of the census taker's questions. See MR. JUSTICE MARSHALL's opinion, as United States Circuit Judge, in *United States* v. *Rickenbacker,* 309 F. 2d 462 (CA2 1962), cert. denied, 371 U. S. 962. What Mrs. James appears to want from the agency that provides her and her infant son with the necessities for life is the right to receive those necessities upon her own

informational terms, to utilize the Fourth Amendment as a wedge for imposing those terms, and to avoid questions of any kind.[9]

8. We are not persuaded, as Mrs. James would have us be, that all information pertinent to the issue of eligibility can be obtained by the agency through an interview at a place other than the home, or, as the District Court majority suggested, by examining a lease or a birth certificate, or by periodic medical examinations, or by interviews with school personnel. 303 F. Supp., at 943. Although these secondary sources might be helpful, they would not always assure verification of actual residence or of actual physical presence in the home, which are requisites for AFDC benefits,[10] or of impending medical needs. And, of course, little children, such as Maurice James, are not yet registered in school.

9. The visit is not one by police or uniformed authority. It is made by a caseworker of some training[11] whose

---

[9] We have examined Mrs. James' case record with the New York City Department of Social Services, which, as an exhibit, accompanied defendant Wyman's answer. It discloses numerous interviews from the time of the initial one on April 27, 1967, until the attempted termination in June 1969. The record is revealing as to Mrs. James' failure ever really to satisfy the requirements for eligibility; as to constant and repeated demands; as to attitude toward the caseworker; as to reluctance to cooperate; as to evasiveness; and as to occasional belligerency. There are indications that all was not always well with the infant Maurice (skull fracture, a dent in the head, a possible rat bite). The picture is a sad and unhappy one.

[10] § 406 (a) of the Social Security Act, as amended, 42 U. S. C. § 606 (a) (1964 ed., Supp. V); § 349B1 of the New York Social Services Law.

[11] The *amicus* brief submitted on behalf of the Social Services Employees Union Local 371, AFSCME, AFL–CIO, the bargaining representative for the social service staff employed in the New York City Department of Social Services, recites that "caseworkers are either badly trained or untrained" and that "[g]enerally, a case-worker is not only poorly trained, but also young and inexperi-

primary objective is, or should be, the welfare, not the prosecution, of the aid recipient for whom the worker has profound responsibility. As has already been stressed, the program concerns dependent children and the needy families of those children. It does not deal with crime or with the actual or suspected perpetrators of crime. The caseworker is not a sleuth but rather, we trust, is a friend to one in need.

10. The home visit is not a criminal investigation, does not equate with a criminal investigation, and despite the announced fears of Mrs. James and those who would join her, is not in aid of any criminal proceeding. If the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect. And if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow,[12] then, even assuming that the evidence discovered upon the home visitation is admissible, an issue upon which we express no opinion, that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct.

11. The warrant procedure, which the plaintiff appears to claim to be so precious to her, even if civil in nature, is not without its seriously objectionable features in the welfare context. If a warrant could be obtained (the plaintiff affords us little help as to how it would be obtained), it presumably could be applied for *ex parte,* its execution would require no notice, it would justify entry

---

enced . . . ." Despite this astonishing description by the union of the lack of qualification of its own members for the work they are employed to do, we must assume that the caseworker possesses at least some qualifications and some dedication to duty.

[12] See, for example, New York Social Services Law § 145.

by force, and its hours for execution [13] would not be so limited as those prescribed for home visitation. The warrant necessarily would imply conduct either criminal or out of compliance with an asserted governing standard. Of course, the force behind the warrant argument, welcome to the one asserting it, is the fact that it would have to rest upon probable cause, and probable cause in the welfare context, as Mrs. James concedes, requires more than the mere need of the caseworker to see the child in the home and to have assurance that the child is there and is receiving the benefit of the aid that has been authorized for it. In this setting the warrant argument is out of place.

It seems to us that the situation is akin to that where an Internal Revenue Service agent, in making a routine civil audit of a tapayer's income tax return, asks that the taxpayer produce for the agent's review some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax. If the taxpayer refuses, there is, absent fraud, only a disallowance of the claimed deduction and a consequent additional tax. The taxpayer is fully within his "rights" in refusing to produce the proof, but in maintaining and asserting those rights a tax detriment results and it is a detriment of the taxpayer's own making. So here Mrs. James has the "right" to refuse the home visit, but a consequence in the form of cessation of aid, similar to the taxpayer's resultant additional tax, flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved.

## VI

*Camara* v. *Municipal Court*, 387 U. S. 523 (1967), and its companion case, *See* v. *City of Seattle*, 387 U. S. 541 (1967), both by a divided Court, are not incon-

---

[13] New York Code Crim. Proc. § 801.

sistent with our result here. Those cases concerned, respectively, a refusal of entry to city housing inspectors checking for a violation of a building's occupancy permit, and a refusal of entry to a fire department representative interested in compliance with a city's fire code. In each case a majority of this Court held that the Fourth Amendment barred prosecution for refusal to permit the desired warrantless inspection. *Frank* v. *Maryland,* 359 U. S. 360 (1959), a case that reached an opposing result and that concerned a request by a health officer for entry in order to check the source of a rat infestation, was *pro tanto* overruled. Both *Frank* and *Camara* involved dwelling quarters. *See* had to do with a commercial warehouse.

But the facts of the three cases are significantly different from those before us. Each concerned a true search for violations. *Frank* was a criminal prosecution for the owner's refusal to permit entry. So, too, was *See*. *Camara* had to do with a writ of prohibition sought to prevent an already pending criminal prosecution. The community welfare aspects, of course, were highly important, but each case arose in a criminal context where a genuine search was denied and prosecution followed.

In contrast, Mrs. James is not being prosecuted for her refusal to permit the home visit and is not about to be so prosecuted. Her wishes in that respect are fully honored. We have not been told, and have not found, that her refusal is made a criminal act by any applicable New York or federal statute. The only consequence of her refusal is that the payment of benefits ceases. Important and serious as this is, the situation is no different than if she had exercised a similar negative choice initially and refrained from applying for AFDC benefits. If a statute made her refusal a criminal offense, and if this case were one concerning her prosecution under that statute, *Camara* and *See* would have conceivable pertinency.

## VII

Our holding today does not mean, of course, that a termination of benefits upon refusal of a home visit is to be upheld against constitutional challenge under all conceivable circumstances. The early morning mass raid upon homes of welfare recipients is not unknown. See *Parrish* v. *Civil Service Comm'n,* 66 Cal. 2d 260, 425 P. 2d 223 (1967); Reich, Midnight Welfare Searches and the Social Security Act, 72 Yale L. J. 1347 (1963). But that is not this case. Facts of that kind present another case for another day.

We therefore conclude that the home visitation as structured by the New York statutes and regulations is a reasonable administrative tool; that it serves a valid and proper administrative purpose for the dispensation of the AFDC program; that it is not an unwarranted invasion of personal privacy; and that it violates no right guaranteed by the Fourth Amendment.

Reversed and remanded with directions to enter a judgment of dismissal.

*It is so ordered.*

MR. JUSTICE WHITE concurs in the judgment and joins the opinion of the Court with the exception of Part IV thereof.

MR. JUSTICE DOUGLAS, dissenting.

We are living in a society where one of the most important forms of property is government largesse which some call the "new property."[1] The payrolls of government are but one aspect of that "new property." Defense contracts, highway contracts, and the other multifarious forms of contracts are another part. So are subsidies to air, rail, and other carriers. So are

---

[1] See Reich, The New Property, 73 Yale L. J. 733, 737–739.

disbursements by government for scientific research.[2]   So are TV and radio licenses to use the air space which of course is part of the public domain.   Our concern here is not with those subsidies but with grants that directly or indirectly implicate the *home life* of the recipients.

In 1969 roughly 127 billion dollars were spent by the federal, state, and local governments on "social welfare." [3] To farmers alone almost four billion dollars were paid, in part for not growing certain crops.   Almost 129,000 farmers received $5,000 or more, their total benefits exceeding $1,450,000,000.[4]   Those payments were in some instances very large, a few running a million or more a year.   But the majority were payments under $5,000 each.

Yet almost every beneficiary whether rich or poor, rural or urban, has a "house"—one of the places protected by the Fourth Amendment against "unreasonable searches and seizures." [5]   The question in this case is whether receipt of largesse from the government makes the *home* of the beneficiary subject to access by an inspector of the agency of oversight, even though the beneficiary objects to the intrusion and even though the Fourth Amendment's procedure for access to one's *house* or *home* is not followed.   The penalty here is not, of course, invasion of the privacy of Barbara James, only her loss of federal or state largesse.   That, however, is merely rephrasing the problem.   Whatever the seman-

---

[2] See Ginzburg, What Science Policy?, Columbia Forum, Fall 1970, p. 12.

[3] See Appendix I to this opinion.

[4] See Appendix II to this opinion.

[5] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

tics, the central question is whether the government by force of its largesse has the power to "buy up" rights guaranteed by the Constitution.[6] But for the assertion of her constitutional right, Barbara James in this case would have received the welfare benefit.

We spoke in *Speiser* v. *Randall*, 357 U. S. 513, of the denial of tax exemptions by a State because of exercise of First Amendment rights.

> "It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech. . . . To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." *Id.*, at 518.

Likewise, while second-class mail rates may be granted or withheld by the Government, we would not allow them to be granted "on condition that certain economic or political ideas not be disseminated." *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 156.

In *Sherbert* v. *Verner*, 374 U. S. 398, a State providing unemployment insurance required recipients to accept suitable employment when it became available or lose the benefits. An unemployed lady was offered a job requiring her to work Saturdays but she refused because she was a Seventh Day Adventist to whom Saturday was the Sabbath. The State canceled her unemployment benefits and we reversed, saying:

> "The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on

---

[6] See Note, Unconstitutional Conditions, 73 Harv. L. Rev. 1595, 1599.

the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

"Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege . . . . [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.*, at 404, 406.

These cases are in the tradition of *United States v. Chicago, M., St. P. & P. R. Co.*, 282 U. S. 311, 328–329,[7] where Mr. Justice Sutherland, writing for the Court, said:

"[T]he rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." [8]

---

[7] And see Hale, Unconstitutional Conditions and Constitutional Rights, 35 Col. L. Rev. 321 (1935); *Frost & Frost Co. v. Railroad Comm'n*, 271 U. S. 583, 594.

[8] *Flemming v. Nestor*, 363 U. S. 603, is not in accord with that tradition. There we upheld the right of Congress to strip away accrued social security benefits. Nestor, an alien, came to this country in 1913. From the enactment of the Social Security Act until 1955 Nestor and his employers contributed payments to the fund. In 1955 Nestor became eligible for old-age benefits. One year later he was deported for having been a member of the

What we said in those cases is as applicable to Fourth Amendment rights as to those of the First. The Fourth, of course, speaks of "unreasonable" searches and seizures, while the First is written in absolute terms. But the right of privacy which the Fourth protects is perhaps as vivid in our lives as the right of expression sponsored by the First. *Griswold* v. *Connecticut*, 381 U. S. 479, 484. If the regime under which Barbara James lives were enterprise capitalism as, for example, if she ran a small factory geared into the Pentagon's procurement program, she certainly would have a right to deny inspectors access to her *home* unless they came with a warrant.

---

Communist Party between 1933 and 1939—a time when it was perfectly legal to be a member. In 1954 Congress passed a law which provided for the loss of social security benefits for anyone deported for having been a member of the Communist Party. Like the law providing for deportation for membership this law, too, was fully retroactive. Thus Nestor was deported after he had retired based on a law condemning membership in the Communist Party at the time when it was legal to be a member, and stripped of his retirement income based on a law which was triggered by that deportation. We upheld the constitutionality of the 1954 law by a 5–4 majority.

The majority stated Nestor's property had not been taken without due process because Nestor had no property rights; his interest was "noncontractual" and could "not be soundly analogized to that of the holder of an annuity." 363 U. S., at 610. The majority then went on to hold social security benefits were only protected from congressional action which is "utterly lacking in rational justification." *Id.*, at 611.

If it was unconstitutional in *Speiser* to condition a tax exemption on a limitation on freedom of speech, it was equally unconstitutional to withhold a social security benefit conditioned on a limitation of freedom of association. A right-privilege distinction was implicitly rejected in *Speiser* and explicitly rejected in *Sherbert*. Today's decision when dealing with a state statute joins *Flemming* as an anomaly in the cases dealing with unconstitutional conditions.

That is the teaching of *Camara* v. *Municipal Court*, 387 U. S. 523, and *See* v. *City of Seattle*, 387 U. S. 541. In those cases we overruled *Frank* v. *Maryland*, 359 U. S. 360, and held the Fourth Amendment applicable to administrative searches of both the *home* and a business. The applicable principle, as stated in *Camara* as "justified by history and by current experience" is that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." 387 U. S., at 528–529. In *See* we added that the "businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id.*, at 543. There is not the slightest hint in *See* that the Government could condition a business license on the "consent" of the licensee to the administrative searches we held violated the Fourth Amendment. It is a strange jurisprudence indeed which safeguards the businessman at his place of work from warrantless searches but will not do the same for a mother in her *home*.

Is a search of her home without a warrant made "reasonable" merely because she is dependent on government largesse?

Judge Skelly Wright has stated the problem succinctly:

> "Welfare has long been considered the equivalent of charity and its recipients have been subjected to all kinds of dehumanizing experiences in the government's effort to police its welfare payments. In fact, over half a billion dollars are expended annually for administration and policing in connection with the Aid to Families with Dependent Children pro-

332

gram. Why such large sums are necessary for administration and policing has never been adequately explained. No such sums are spent policing the government subsidies granted to farmers, airlines, steamship companies, and junk mail dealers, to name but a few. The truth is that in this subsidy area society has simply adopted a double standard, one for aid to business and the farmer and a different one for welfare." Poverty, Minorities, and Respect For Law, 1970 Duke L. J. 425, 437–438.

If the welfare recipient was not Barbara James but a prominent, affluent cotton or wheat farmer receiving benefit payments for not growing crops, would not the approach be different? Welfare in aid of dependent children, like social security and unemployment benefits, has an aura of suspicion.[9] There doubtless are frauds in every sector of public welfare whether the recipient be a Barbara James or someone who is prominent or influential. But constitutional rights—here the privacy of the *home*—are obviously not dependent on the poverty or on the affluence of the beneficiary. It is the precincts of the *home* that the Fourth Amendment protects; and

---

[9] Juvenal wrote:

"Poverty's greatest curse, much worse than the fact of it, is that it makes men objects of mirth, ridiculed, humbled, embarrassed." Satires 39 (Indiana Univ. Press 1958).

In the 1837 Term the Court held in *City of New York* v. *Miln*, 11 Pet. 102, that New York could require ships coming in from abroad to report the names, ages, etc., of every person brought to these shores. The Court said: "We think it as competent and as necessary for a state to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts; as it is to guard against the physical pestilence, which may arise from unsound and infectious articles imported, or from a ship, the crew of which may be labouring under an infectious disease." *Id.*, at 142.

I regretfully conclude that today's decision is ideologically of the same vintage.

their privacy is as important to the lowly as to the mighty.[10]

"[S]tudies tell us that the typical middle income American reaches retirement age with a whole

---

[10] An individual who refuses to allow the home visit could either be a welfare recipient at the time or an applicant for assistance. In neither case would the outcome of the refusal be different.

If the mother is already a recipient, Social Services Regulations § 351.21, 18 NYCRR § 351.21, requires continuing contacts at home between the recipient and the social worker. Should a recipient refuse a visit then § 175 of the Policies Governing the Administration of Public Assistance ("Mandatory visits must be made in accordance with law that requires that persons be visited . . . .") would require termination. When the decision to "discontinue, suspend or reduce" benefits is made, the recipient would receive a hearing under § 351.26 at which the recipient could present "written and oral relevant evidence and argument to demonstrate why his grant should not be discontinued, suspended or reduced." Since § 134 of the Social Services Law requires visits, the refusal to allow the visit would apparently be dispositive of the matter.

That seems to be conceded here by the commissioner. In light of that fact, the failure of appellee, who went to a hearing and was denied relief, to pursue any further state remedy seems irrelevant as the only question posed was the constitutionality under the Fourth Amendment of the termination of assistance for failure to agree to the warrantless entry into her home.

Except in very limited circumstances (Social Services Regulations §§ 351.10 and 372 (Emergency Assistance)) an initial home visit and investigation is necessary before receiving benefits. Should a potential recipient refuse the initial visit, he would be notified under § 351.14 (b) of the reason for the denial. Then he could request a "fair hearing" under Board Rule 85 and Social Services Regulations § 358. Again it appears that refusing the visit would be dispositive of the claim.

The extent to which a person could receive emergency assistance after refusal of a visit is unclear. Social Services Regulations § 372.3 recognizes that emergency assistance could be available to a person while the "fair hearing" is pending. It would seem, however, that implicit in § 372.3 is the notion that, if the claim is disposed of, then the emergency assistance would terminate. Also emergency assistance is limited to periods not in excess of 30 consecutive days in any 12-month period. Social Services Regulations § 372.1.

334

bundle of interests and expectations: as homeowner, as small investor, and as social security 'beneficiary.' Of these, his social security retirement benefits are probably his most important resource. Should this, the most significant of his rights, be entitled to a quality of protection inferior to that afforded his other interests? It becomes the task of the rule of law to surround this new 'right' to retirement benefits with protections against arbitrary government action, with substantive and procedural safeguards that are as effective in context as the safeguards enjoyed by traditional rights of property in the best tradition of the older law." [11]

It may be that in some tenements one baby will do service to several women and call each one "mom." It may be that other frauds, less obvious, will be perpetrated. But if inspectors want to enter the precincts of the home against the wishes of the lady of the house, they must get a warrant. The need for exigent action as in cases of "hot pursuit" is not present, for the lady will not disappear; nor will the baby.

I would place the same restrictions on inspectors entering the *homes* of welfare beneficiaries as are on inspectors entering the *homes* of those on the payroll of government, or the *homes* of those who contract with the government, or the *homes* of those who work for those having government contracts. The values of the *home* protected by the Fourth Amendment are not peculiar to capitalism as we have known it; they are equally relevant to the new form of socialism which we are entering. Moreover, as the numbers of functionaries and inspectors multiply, the need for protection of the individual be-

---

[11] Jones, The Rule of Law and the Welfare State, 58 Col. L. Rev. 143, 154–155 (1958).

comes indeed more essential if the values of a free society
are to remain.

What Lord Acton wrote Bishop Creighton [12] about the
corruption of power is increasingly pertinent today:

> "I cannot accept your canon that we are to
> judge Pope and King unlike other men, with a
> favourable presumption that they did no wrong. If
> there is any presumption it is the other way against
> holders of power, increasing as the power increases.
> Historic responsibility has to make up for the want
> of legal responsibility. Power tends to corrupt and
> absolute power corrupts absolutely. Great men are
> almost always bad men, even when they exercise
> influence and not authority: still more when you
> superadd the tendency or the certainty of corrup-
> tion by authority."

The bureaucracy of modern government is not only
slow, lumbering, and oppressive; it is omnipresent. It
touches everyone's life at numerous points. It pries
more and more into private affairs, breaking down the
barriers that individuals erect to give them some insula-
tion from the intrigues and harassments of modern life.[13]
Isolation is not a constitutional guarantee; but the
sanctity of the sanctuary of the *home* is such—as marked
and defined by the Fourth Amendment, *McDonald* v.
*United States,* 335 U. S. 451, 453. What we do today
is to depreciate it.

I would sustain the judgment of the three-judge court
in the present case.

---

[12] J. Acton, Essays on Freedom and Power 364 (H. Finer ed.
1948).

[13] Mass raids upon the homes of welfare recipients are matters
of record. See *Parrish* v. *Civil Service Comm'n,* 66 Cal. 2d 260,
425 P. 2d 223, where an inspector was discharged because he refused
to engage in such "illegal activity" and was granted relief by way
of back pay.

# APPENDIX I TO OPINION OF DOUGLAS, J., DISSENTING

STATISTICAL ABSTRACT OF THE UNITED STATES, 1970, p. 277.

SOCIAL WELFARE EXPENDITURES, BY SOURCE OF FUNDS AND PUBLIC PROGRAM: 1967 TO 1969

(In millions of dollars)

| PROGRAM | 1967 | | 1968 | | 1969 (prel.) | |
|---|---|---|---|---|---|---|
| | Federal | State and local | Federal | State and local | Federal | State and local |
| Total | 53,244 | 46,449 | 60,548 | 51,497 | 68,595 | 58,206 |
| Social insurance | 30,544 | 6,724 | 35,391 | 7,302 | 40,824 | 7,896 |
| Old-age, survivors, disability, health ins | 24,581 | (X) | 28,748 | (X) | 33,389 | (X) |
| Health insurance for the aged | 3,895 | (X) | 5,347 | (X) | 6,598 | (X) |
| Railroad retirement | 1,278 | (X) | 1,417 | (X) | 1,547 | (X) |
| Public employee retirement [1] | 3,725 | 2,178 | 4,167 | 2,416 | 4,739 | 2,740 |
| Unemployment ins. and employment serv.[2] | 790 | 1,963 | 873 | 2,055 | 932 | 2,021 |
| Railroad unemployment insurance | 38 | (X) | 46 | (X) | 45 | (X) |
| Railroad temporary disability insurance | 38 | (X) | 36 | (X) | 58 | (X) |
| State temporary disability insurance [3] | (X) | 530 | (X) | 574 | (X) | 635 |
| Hospital and medical benefits | (X) | 54 | (X) | 55 | (X) | 53 |
| Workmen's compensation [4] | 94 | 2,054 | 103 | 2,257 | 114 | 2,500 |
| Hospital and medical benefits | 14 | 681 | 15 | 750 | 17 | 833 |
| Public aid | 5,244 | 3,567 | 6,455 | 4,637 | 7,851 | 5,592 |
| Public assistance | 4,266 | 3,567 | 5,250 | 4,637 | 6,389 | 5,592 |
| Vendor medical payments | 1,157 | 1,228 | 1,760 | 1,821 | 2,186 | 2,235 |
| Other [5] | 979 | – | 1,205 | – | 1,462 | – |
| Health and medical programs [6] | 3,681 | 4,128 | 4,233 | 4,038 | 4,497 | 4,321 |
| Hospital and medical care | 1,596 | 2,658 | 1,835 | 2,708 | 1,967 | 2,827 |
| Civilian programs | 164 | 2,658 | 187 | 2,708 | 200 | 2,827 |
| Defense Department [7] | 1,432 | (X) | 1,648 | (X) | 1,766 | (X) |
| Maternal and child health programs [8] | 139 | 171 | 161 | 176 | 192 | 190 |
| Medical research | 1,290 | 65 | 1,479 | 69 | 1,401 | 73 |
| School health (educational agencies) | (X) | 178 | (X) | 190 | (X) | 204 |
| Other public health activities [9] | 373 | 667 | 427 | 434 | 551 | 527 |
| Medical facilities construction | 284 | 389 | 332 | 461 | 386 | 500 |
| Defense Department | 50 | (X) | 29 | (X) | 59 | (X) |
| Other | 234 | 389 | 305 | 461 | 327 | 500 |
| Veterans programs | 6,857 | 23 | 7,329 | 33 | 7,996 | 40 |
| Pensions and compensation [10] | 4,487 | (X) | 4,716 | (X) | 5,041 | (X) |
| Health and medical programs | 1,346 | (X) | 1,465 | (X) | 1,585 | (X) |
| Hospital and medical care | 1,250 | (X) | 1,372 | (X) | 1,478 | (X) |
| Hospital construction | 49 | (X) | 46 | (X) | 54 | (X) |
| Medical and prosthetic research | 47 | (X) | 46 | (X) | 53 | (X) |
| Education | 297 | (X) | 466 | (X) | 671 | (X) |
| Life insurance [11] | 548 | (X) | 504 | (X) | 503 | (X) |
| Welfare and other | 179 | 23 | 179 | 33 | 197 | 40 |
| Education [12] | 5,279 | 30,389 | 5 108 | 33 648 | 5 079 | 37,954 |
| Elementary and secondary | 2,497 | 25,247 | 2,638 | 28,065 | 2,472 | 31,963 |
| Construction [13] | 33 | 3,937 | 35 | 4,184 | 34 | 4,620 |
| Higher | 2,089 | 4,400 | 1,807 | 4,800 | 1,943 | 5,100 |
| Construction | 710 | 900 | 474 | 1,000 | 431 | 1,100 |
| Vocational and adult [13] | 552 | 742 | 519 | 783 | 514 | 891 |
| Housing | 283 | 95 | 325 | 103 | 446 | 110 |
| Other social welfare | 1,356 | 1,524 | 1,706 | 1,736 | 1,903 | 2,293 |
| Vocational rehabilitation, total | 319 | 91 | 363 | 106 | 431 | 127 |
| Medical services and research | 78 | 17 | 98 | 26 | 116 | 31 |
| Institutional care [14] | 15 | 880 | 23 | 1,015 | 26 | 1,495 |
| School meals | 442 | 147 | 544 | 162 | 624 | 171 |
| Child welfare [15] | 47 | 406 | 50 | 453 | 50 | 500 |
| Special OEO programs [16] | 452 | (X) | 608 | (X) | 647 | (X) |
| Social welfare, not elsewhere classified[17] | 81 | (X) | 118 | (X) | 124 | (X) |

– Represents zero.  X Not applicable.

[1] Excludes refunds to those leaving service. Federal data include military retirement.

[2] Includes compensation for Federal employees and ex-servicemen, and trade adjustment and cash training allowances.

[3] Programs operate in 4 States only: Calif., N.J., N.Y., and R.I.  [4] Benefits by private insurance carriers, State funds, and self-insurers.  [5] Work relief, other emergency aid, surplus food for the needy, food stamps, and Job Corps, Neighborhood Youth Corps, and Work-Experience programs under the Economic Opportunity Act.

[6] Excludes domiciliary care in institutions other than mental or tuberculosis, and services included with other programs in social welfare series.  [7] Includes cost of medical care for military dependent families.

[8] Includes services for crippled children.  [9] Excludes water supply and sanitation services.

[10] Includes burial awards.  [11] Excludes servicemen's group life insurance.  [12] Federal expenditures for administrative costs (Office of Education) and research not shown separately but included in total.

[13] Construction costs of vocational and adult education programs included under elementary-secondary expenditures.

[14] Represents primarily surplus food for nonprofit institutions.  [15] Represents primarily child welfare services under title V of the Social Security Act.  [16] Includes community action, migrant workers, and VISTA programs and all administrative expenses of the Office of Economic Opportunity.

[17] Includes administrative expenses of the Secretary of Health, Education, and Welfare; Indian welfare; aging activities; certain manpower activities; and other items.

Source: Dept. of Health, Education, and Welfare, Social Security Administration; *Social Security Bulletin*, December 1969.

## APPENDIX II TO OPINION OF DOUGLAS, J., DISSENTING

Hearings on H. R. 17923 before the Senate Committee on Appropriations, 91st Cong., 2d Sess., pt. 3, p. 1979.

U. S. Department of Agriculture
Agricultural Stabilization and Conservation Service
ASCS Payments to Producers, All Programs,[1] Calendar Year 1969

|  | Amount | Percent of total |
|---|---|---|
| Total payments................ | $3,794,996,353 | 100 |
| Payments below $5,000......... | 2,078,439,326 | 55 |
| Payments $5,000 or above...... | 1,457,635,442 | 38 |
| Undistributed [2] ............... | 258,921,585 | 7 |

[1] Includes acreage diversion payments on cotton, feed grain, and wheat; price support payments on cotton and feed grain; wheat marketing certificates; cost-share payments under the Agricultural Conservation Program, emergency conservation and Appalachia programs; land retirement and conservation assistance payments under the cropland conversion, cropland adjustment, and conservation reserve programs; and the milk indemnity payment program. Does not include any price support loans or purchases, and payments under the Sugar Act and the National Wool Act.

[2] Includes payments to producers under the Sugar Act and the National Wool Act and payments to vendors for costs of conservation materials and services and funds transferred to other agencies for conservation technical services under the Agricultural Conservation Program; promotion fund deduction withheld under the National Wool Act which were transferred to the National Sheep Producers Council.

ASCS Payments by Size Groupings $5,000 and over
(Excludes sugar and wool payments)

| Range | Number | Amount |
|---|---|---|
| $5,000 to $7,499................. | 61,330 | $ 370,839,000 |
| $7,500 to $9,999................. | 25,859 | 222,488,754 |
| $10,000 to $14,999............... | 21,147 | 254,979,861 |
| $15,000 to $24,999............... | 12,856 | 242,547,832 |
| $25,000 to $49,999............... | 6,029 | 200,524,421 |
| $50,000 to $99,999............... | 1,404 | 91,191,225 |
| $100,000 to $499,999............. | 346 | 55,113,824 |
| $500,000 to $999,999............. | 11 | 7,668,176 |
| $1,000,000 and over.............. | 5 | 12,282,349 |
| Total ......................... | 128,987 | $1,457,635,442 |

338

MR. JUSTICE MARSHALL, whom MR. JUSTICE BRENNAN joins, dissenting.

Although I substantially agree with its initial statement of the issue in this case, the Court's opinion goes on to imply that the appellee has refused to provide information germane to a determination of her eligibility for AFDC benefits. The record plainly shows, however, that Mrs. James offered to furnish any information that the appellants desired and to be interviewed at any place other than her home. Appellants rejected her offers and terminated her benefits solely on the ground that she refused to permit a home visit. In addition, appellants make no contention that any sort of probable cause exists to suspect appellee of welfare fraud or child abuse.

Simply stated, the issue in this case is whether a state welfare agency can require all recipients of AFDC benefits to submit to warrantless "visitations" of their homes. In answering that question, the majority dodges between constitutional issues to reach a result clearly inconsistent with the decisions of this Court. We are told that there is no search involved in this case; that even if there were a search, it would not be unreasonable; and that even if this were an unreasonable search, a welfare recipient waives her right to object by accepting benefits. I emphatically disagree with all three conclusions. Furthermore, I believe that binding regulations of the Department of Health, Education, and Welfare prohibit appellants from requiring the home visit.

I

The Court's assertion that this case concerns no search "in the Fourth Amendment meaning of that term" is neither "obvious" nor "simple." I should have thought that the Fourth Amendment governs all intrusions by agents of the public upon personal security,

*Terry* v. *Ohio,* 392 U. S. 1, 18 n. 15 (1968). As MR. JUSTICE HARLAN has said:

> "[T]he Constitution protects the privacy of the home against all unreasonable intrusion of whatever character. . . . '[It applies] to all invasions on the part of the government and its employés of the sanctity of a man's home,' " *Poe* v. *Ullman,* 367 U. S. 497, 550–551 (1961) (dissenting opinion).

This Court has rejected as "anomalous" the contention that only suspected criminals are protected by the Fourth Amendment, *Camara* v. *Municipal Court,* 387 U. S. 523, 530 (1967). In an era of rapidly burgeoning governmental activities and their concomitant inspectors, caseworkers, and researchers, a restriction of the Fourth Amendment to "the traditional criminal law context" tramples the ancient concept that a man's home is his castle. Only last Term, we reaffirmed that this concept has lost none of its vitality, *Rowan* v. *United States Post Office,* 397 U. S. 728, 738 (1970).

Even if the Fourth Amendment does not apply to each and every governmental entry into the home, the welfare visit is not some sort of purely benevolent inspection. No one questions the motives of the dedicated welfare caseworker. Of course, caseworkers seek to be friends, but the point is that they are also required to be sleuths. The majority concedes that the "visitation" is partially investigative, but claims that this investigative aspect has been given too much emphasis. Emphasis has indeed been given. Time and again, in briefs and at oral argument, appellants emphasized the need to enter AFDC homes to guard against welfare fraud and child abuse, both of which are felonies.[1] The New York

---

[1] For example, appellants' Reply Brief offers two specific illustrations of the home visit's efficacy. In the first, a man was discovered in the home and benefits were terminated. In the second, child abuse was discovered.

statutes provide emphasis by requiring all caseworkers to report any evidence of fraud that a home visit uncovers, N. Y. Social Services Law § 145. And appellants have strenuously emphasized the importance of the visit to provide evidence leading to civil forfeitures including elimination of benefits and loss of child custody.

Actually, the home visit is precisely the type of inspection proscribed by *Camara* and its companion case, *See* v. *City of Seattle*, 387 U. S. 541 (1967), except that the welfare visit is a more severe intrusion upon privacy and family dignity. Both the home visit and the searches in those cases may convey benefits to the householder. Fire inspectors give frequent advice concerning fire prevention, wiring capacity, and other matters, and obvious self-interest causes many to welcome the fire or safety inspection. Similarly, the welfare caseworker may provide welcome advice on home management and child care. Nonetheless, both searches may result in the imposition of civil penalties—loss or reduction of welfare benefits or an order to upgrade a housing defect. The fact that one purpose of the visit is to provide evidence that may lead to an elimination of benefits is sufficient to grant appellee protection since *Camara* stated that the Fourth Amendment applies to inspections which can result in only civil violations, 387 U. S., at 531. But here the case is stronger since the home visit, like many housing inspections, may lead to criminal convictions.

The Court attempts to distinguish *See* and *Camara* by telling us that those cases involved "true" and "genuine" searches. The only concrete distinction offered is that *See* and *Camara* concerned criminal prosecutions for refusal to permit the search. The *Camara* opinion did observe that one could be prosecuted for a refusal to allow that search; but, apart from the issue of consent, there is neither logic in, nor precedent for, the view that the

ambit of the Fourth Amendment depends not on the character of the governmental intrusion but on the size of the club that the State wields against a resisting citizen. Even if the magnitude of the penalty were relevant, which sanction for resisting the search is more severe? For protecting the privacy of her home, Mrs. James lost the sole means of support for herself and her infant son. For protecting the privacy of his commercial warehouse, Mr. See received a $100 suspended fine.

Conceding for the sake of argument that someone might view the "visitation" as a search, the majority nonetheless concludes that such a search is not unreasonable. However, its mode of reaching that conclusion departs from the entire history of Fourth Amendment case law. Of course, the Fourth Amendment test is reasonableness, but in determining whether a search is reasonable, this Court is not free merely to balance, in a totally ad hoc fashion, any number of subjective factors. An unbroken line of cases holds that, subject to a few narrowly drawn exceptions, any search without a warrant is constitutionally unreasonable, see, *e. g., Agnello* v. *United States.,* 269 U. S. 20, 32 (1925); *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948); *Chapman* v. *United States,* 365 U. S. 610, 613–615 (1961); *Camara* v. *Municipal Court,* 387 U. S. 523, 528–529 (1967); *Chimel* v. *California,* 395 U. S. 752, 762 (1969); *Vale* v. *Louisiana,* 399 U. S. 30, 34–35 (1970). In this case, no suggestion that evidence will disappear, that a criminal will escape, or that an officer will be injured, justifies the failure to obtain a warrant. Instead, the majority asserts what amounts to three state interests that allegedly render this search reasonable. None of these interests is sufficient to carve out a new exception to the warrant requirement.

First, it is argued that the home visit is justified to protect dependent children from "abuse" and "exploita-

tion." These are heinous crimes, but they are not confined to indigent households. Would the majority sanction, in the absence of probable cause, compulsory visits to all American homes for the purpose of discovering child abuse? Or is this Court prepared to hold as a matter of constitutional law that a mother, merely because she is poor, is substantially more likely to injure or exploit her children? Such a categorical approach to an entire class of citizens would be dangerously at odds with the tenets of our democracy.

Second, the Court contends that caseworkers must enter the homes of AFDC beneficiaries to determine eligibility. Interestingly, federal regulations do not require the home visit. In fact, the regulations specify the recipient himself as the primary source of eligibility information thereby rendering an inspection of the home only one of several alternative secondary sources.[2] The majority's implication that a biannual home visit somehow assures the verification of actual residence or actual physical presence in the home strains credulity in the context of urban poverty. Despite the caseworker's responsibility for dependent children, he is not even required to see the children as a part of the home visit.[3] Appellants offer scant explanation for their refusal even to attempt to utilize public records, expenditure receipts, documents such as leases, non-home interviews, personal financial records, sworn declarations, etc.—all sources that governmental agencies regularly accept as ade-

[2] HEW Handbook of Public Assistance Administration, pt. IV, § 2200 (e) (1).

[3] Appellants respond by asserting that if the caseworker becomes suspicious concerning the child's absence, further investigation may take place. One certainly would hope that the caseworker would continue his investigation, but the fact remains that the failure to require that the child be seen undercuts the argument that the home visit is designed to protect the child's welfare and necessary to verify his presence in the home.

quate to establish eligibility for other public benefits. In this setting, it ill behooves appellants to refuse to utilize informational sources less drastic than an invasion of the privacy of the home.

We are told that the plight of Mrs. James is no different from that of a taxpayer who is required to document his right to a tax deduction, but this analogy is seriously flawed. The record shows that Mrs. James has offered to be interviewed anywhere other than her home, to answer any questions, and to provide any documentation that the welfare agency desires. The agency curtly refused all these offers and insisted on its "right" to pry into appellee's home. Tax exemptions are also governmental "bounty." A true analogy would be an Internal Revenue Service requirement that in order to claim a dependency exemption, a taxpayer *must* allow a specially trained IRS agent to invade the home for the purpose of questioning the occupants and looking for evidence that the exemption is being properly utilized for the benefit of the dependent. If such a system were even proposed, the cries of constitutional outrage would be unanimous.

Appellants offer a third state interest that the Court seems to accept as partial justification for this search. We are told that the visit is designed to rehabilitate, to provide aid. This is strange doctrine indeed. A paternalistic notion that a complaining citizen's constitutional rights can be violated so long as the State is somehow helping him is alien to our Nation's philosophy. More than 40 years ago, Mr. Justice Brandeis warned:

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." *Olmstead* v. *United States,* 277 U. S. 438, 479 (1928) (dissenting opinion).

344

Throughout its opinion, the majority alternates between two views of the State's interest in requiring the home visit. First we are told that the State's purpose is benevolent so that no search is involved. Next we are told that the State's need to prevent child abuse and to avoid the misappropriation of welfare funds justifies dispensing with the warrant requirement. But when all the State's purposes are considered at one time, I can only conclude that the home visit is a search and that, absent a warrant, that search is unreasonable.[4]

Although the Court does not agree with my conclusion that the home visit is an unreasonable search, its opinion suggests that even if the visit were unreasonable, appellee has somehow waived her right to object. Surely the majority cannot believe that valid Fourth Amendment consent can be given under the threat of the loss of one's sole means of support. Nor has Mrs. James waived her rights. Had the Court squarely faced the question of whether the State can condition welfare payments on the waiver of clear constitutional rights, the answer would be plain. The decisions of this Court do not support the notion that a State can use welfare benefits as a wedge to coerce "waiver" of Fourth Amendment rights, see Reich, Midnight Welfare Searches and the Social Security Act, 72 Yale L. J. 1347, 1349–1350 (1963); Note, Rehabilitation, Investigation and the Welfare Home Visit, 79 Yale L. J. 746, 758

---

[4] Since the majority refuses to sanction the warrant procedure in any form, I have not discussed what standard should be required for a warrant to issue. Certainly, if one of the purposes of the welfare search is to obtain evidence of criminal conduct, that is no reason to permit less than probable cause. And because the home visit is a more severe intrusion than is the housing inspection and there are less drastic means to obtain eligibility information, I would apply the analysis of *Camara* and would be inclined to utilize a traditional probable cause standard.

(1970). In *Sherbert* v. *Verner*,[5] this Court did not say, "Aid merely ceases. There is no abridgment of religious freedom." Nor did the Court say in *Speiser* v. *Randall*,[6] "The tax is simply increased. No one is compelled to relinquish First Amendment rights." As my Brother DOUGLAS points out, the majority's statement that Mrs. James' "choice [to be searched or to lose her benefits] is entirely hers, and nothing of constitutional magnitude is involved" merely restates the issue. To MR. JUSTICE DOUGLAS' eloquent discussion of the law of unconstitutional conditions, I would add only that this Court last Term reaffirmed *Sherbert* and *Speiser* as applicable to the law of public welfare:

> "Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation ... denial of a tax exemption ... or ... discharge from public employment." *Goldberg* v. *Kelly*, 397 U. S. 254, 262 (1970).

## II

The Court's examination of the constitutional issues presented by this case has constrained me to respond. It would not have been necessary to reach these questions for I believe that HEW regulations, binding on the States, prohibit the unconsented home visit.[7]

---

[5] 374 U. S. 398 (1963).

[6] 357 U. S. 513 (1958).

[7] It is a time-honored doctrine that statutes and regulations are first examined by a reviewing court to see if constitutional questions can be avoided, *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring); see, *e. g.*, *Dandridge* v. *Williams*, 397 U. S. 471 (1970); *King* v. *Smith*, 392 U. S. 309 (1968). The court below chose not to invoke this doctrine, and litigation in this Court has emphasized the constitutional issues. However, the nonconstitutional questions were briefed by an *amicus curiae* and

The federal Handbook of Public Assistance Adminis-
tration provides:

> "The [state welfare] agency especially guards
> against violations of legal rights and common decen-
> cies in such areas as entering a home by force, or
> *without permission,* or under false pretenses; making
> home visits outside of working hours, and par-
> ticularly making such visits during sleeping
> hours . . . ." Part IV, § 2300 (a) (emphasis supplied).

Although the tone of this language is descriptive, HEW
requirements are stated in terms of principles and objec-
tives, Handbook, pt. I, § 4210 (3); and appellants do
not contend that this regulation is merely advisory. In-
stead, appellants respond with the tired assertion that
consent obtained by threatening termination of benefits
constitutes valid permission under this regulation.
There is no reason to suspect that HEW shares this
crabbed view of consent. The Handbook, itself, insists
on careful scrutiny of purported consent, pt. IV, § 2400.
Section 2200 (a) is designed to protect the privacy of
welfare recipients, and it would be somewhat ironic to
adopt a construction of the regulation that provided
that any person who invokes his privacy rights ceases
to be a recipient.

Appellants next object that the home visit has long
been a part of welfare administration and has never
been disapproved by HEW. The short answer to this
is that we deal with only the *unconsented* home visit.
The general utility and acceptance of the home visit
casts little light on whether HEW might prefer not to
impose the visit on unwilling recipients. Appellants also
remind us that the Federal Government itself requires a
limited number of home visits for sampling purposes.

---

appellants responded fully in their Reply Brief. The parties may
prefer a decision on constitutional grounds; but we, of course, are
not bound by their litigation strategies.

However, while there may well be a special need to employ mandatory visits as a part of quality control samples, Mrs. James' home was not a part of such a sample. Furthermore appellants admit that § 2200 (a) governs the quality control program; so it is not clear that unconsented home visits are allowed even for sampling purposes. Although there appears to be no regulatory history, appellants tell us § 2200 (a) merely permits a recipient to refuse a particular home visit and does not allow him to forbid home visits altogether. I suppose that one could read such a limitation into the section, but given the regulation's explicit language, given that HEW does not require home visits and views the visits as only one of several alternative sources of eligibility information, given HEW's concern for the privacy of its clients, and given the durable principle of this Court that doubtful questions of interpretation should be resolved in a manner which avoids constitutional questions, *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407 (1909), I would conclude that Mrs. James is protected by § 2200 (a).

## III

In deciding that the homes of AFDC recipients are not entitled to protection from warrantless searches by welfare caseworkers, the Court declines to follow prior case law and employs a rationale that, if applied to the claims of all citizens, would threaten the vitality of the Fourth Amendment. This Court has occasionally pushed beyond established constitutional contours to protect the vulnerable and to further basic human values. I find no little irony in the fact that the burden of today's departure from principled adjudication is placed upon the lowly poor. Perhaps the majority has explained why a commercial warehouse deserves more protection than does this poor woman's home. I am not convinced; and, therefore, I must respectfully dissent.