BAILA JAMISON, Plaintiff-Appellant, *v.* EDWARD T. WEAVER *et al.*, Defendants-Appellees.

(No. 60409; )

First District (2nd Division)—June 30, 1975.

James O. Latturner and John R. Sweeney, both of Legal Assistance Foundation, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Robert G. Epsteen, Assistant Attorney General, of counsel), for appellees.

· Mr. JUSTICE STAMOS delivered the opinion of the court:

This action was brought under the Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, par. 264 *et seq.*), to review a decision of the *Illinois* Department of Public Aid (IDPA) which reduced plaintiff's public aid grant. The circuit court of Cook County entered judgment affirming the administrative decision and plaintiff appeals from that judgment. It is plaintiff's contention that the reduction in aid resulted from an administrative decision that plaintiff was living with and receiving support from her allegedly estranged husband. She further contends that the decision is unsupported by findings of fact and is against the manifest weight of the evidence because it is predicated upon hearsay evidence. The State, on the other hand, contends that the reduction in plaintiff's assistance grant was not predicated upon a finding that she was living with or receiving support from her husband, but rather, was grounded upon the finding that plaintiff had refused to provide information which was necessary for the County Department to determine plaintiff's eligibility for aid. The record, in pertinent part, reveals the following:

Plaintiff commenced receiving public assistance in September of 1968 to meet both her own needs and those of her child. As a result of her marriage to Lee Jamison in May of 1970, plaintiff's individual public aid grant was terminated although she continued to receive a grant for her eligible child. In September of 1970, plaintiff advised the County Department that her husband had deserted her and was not furnishing any support. Her grant was then reinstated. On April 25, 1972, the County Department sent written notification informing plaintiff that:

"It is necessary for us to delete your needs from the Grant until such time as you can establish your eligibility for further assistance. This will be effective for the month of May 1972.

As you know, your husband lists your address with his employer, your address appears on his car registration, he has frequently answered the phone in your home. We have talked with him by phone in your home, asking both, you and Mr. Jamison to come to the office to talk with us. Mr. Jamison told us he could not do this because he is fully employed. As you know, a husband is responsible for the support of his wife.

We need to know about the financing of your college education. To date you have not given us permission to contact the University. You have also refused to show us a copy of your 1971 income tax return."

From this decision of the County Department, plaintiff originally filed an appeal on May 11, 1972. After several continuances, a hearing was scheduled for July 17, 1972. Plaintiff failed to appear at the hearing and

her appeal was dismissed. Effective as of August 1972, plaintiff's individual aid grant was terminated,[1] and on August 11, 1972, plaintiff appealed from the decision of the County Department in terminating her individual aid grant and from the dismissal of her prior appeal.[2] A hearing was scheduled for August 28, 1972.

At that hearing, Gale Geiser, plaintiff's former caseworker, testified that she was informed in September of 1970, by plaintiff that her husband had deserted her and was not furnishing any support. Over vigorous objection on the grounds of hearsay, caseworker Geiser further testified that in December of 1970, she was told by Margaret Carson, plaintiff's building manager, that Mr. Jamison resided with plaintiff, that he had never left plaintiff, and furthermore, that the two were never legally married.

Mrs. Aldona, plaintiff's caseworker, was not present at the hearing but her case notes were read into the record by Joan Frankel, a supervising caseworker. Again, hearsay objections were made and overruled. The notes revealed that on January 24, 1972, the caseworker endeavored to visit plaintiff at her residence. A man answered through the speaker, but would not admit the caseworker into the apartment. On January 27, 1972, plaintiff was seen by the caseworker driving a small red car, license number VM 9373. According to the notes, public records indicate that the vehicle was registered in the name of Lee Jamison residing at 920 West Lakeside, Chicago, Illinois.

On January 28, 1972, Mrs. Aldona's notes indicated that she was informed by a Mrs. Rushing, plaintiff's building manager at the time, that the same man had been living with the plaintiff since they moved into the building 2 years previously. Mrs. Rushing informed the caseworker that the first lease was signed by both Lee Jamison and Baila Jamison, but the second lease, by plaintiff's request, was in plaintiff's name alone. On January 31, 1972, caseworker Aldona had a conversation with a Gerry Baloan, the assistant manager for plaintiff's building, who advised the caseworker that Lee Jamison was living with Baila Jamison, and that Mrs. Jamison had requested parking privileges for a red Toyota, license number VM 9373.

In February of 1972, an investigation of Mrs. Jamison's current employment was requested by the County Department. Through an inter-

---

[1] The parties to this appeal refer to "reduction" in plaintiff's aid grant inasmuch as plaintiff continued to receive aid for her eligible child.

[2] The County Department held that it was without jurisdiction to act on the dismissal of plaintiff's May 11, 1972, appeal, but scheduled a hearing on the issue of plaintiff's eligibility for further assistance. The dismissal of the May 11, 1972, appeal is not challenged by plaintiff.

view with an employee of the Four Torches Restaurant on April 28, 1972, it was ascertained that Lee Jamison was presently employed at the restaurant as a cook, that he began his employment in September of 1971, and that his employment application stated that he resides with Baila Jamison at 920 West Lakeside. On April 11, 1972, the caseworker's notes indicate that she telephoned plaintiff's residence; the telephone was answered by Lee Jamison who stated that he was visiting plaintiff because she wasn't feeling well.

On cross-examination, Mrs. Frankel admitted that in February of 1972, plaintiff informed the caseworker that her husband was living at 4802 Winthrop Avenue, Chicago, Illinois. The caseworker visited the premises and noticed Lee Jamison's name on the mailbox; she was unable, however, to contact him at this time. The caseworker did not attempt to talk to the building manager nor did she further endeavor to ascertain whether Lee Jamison resided on the premises.

Mrs. Jamison testified that Lee Jamison deserted her in September of 1970. On occasion, however, he visited her when she was ill. Other than some money which she received from him in January of 1971, she did not receive support from her husband. Mrs. Jamison further stated that her husband occasionally allowed her use of his automobile for transporting her daughter to the doctor, etc. She also explained that a male friend, Ernest Harris, constantly visits her at home, and probably was the "man" referred to in the caseworker's notes. She further stated that one week prior to the present hearing, the County Department processed a non-support complaint and warrant against Mr. Jamison in her name for which Mr. Jamison was arrested.[3]

Without objection, two documents were admitted into evidence. Plaintiff submitted the lease for her apartment at 920 West Lakeside for the term of August 1, 1971, to July 31, 1972. The lease indicates that the only occupants of the apartment are Baila Jamison, who is listed as head of the house, and Marne Brown, her daughter. The lease is signed by Baila Jamison as lessee and Mrs. Rushing for the lessor. Additionally, plaintiff presented a lease dated February 11, 1972, for an apartment at 4802 Winthrop with Lee Jamison as lessee.

Prior to the conclusion of the hearing, Mrs. Frankel, the supervising caseworker, asked the following questions of Mrs. Jamison:

"Mrs. Frankel: Well, then may we ask, as long as you brought up the 1040, did you file a 1040 this—in 1971?

---

[3] In the nonsupport action, *Baila Jamison v. Lee Jamison,* No. 71 MC 505485, heard on February 13, 1973, the court found that Lee Jamison was not supporting his wife and he was ordered to pay $108.33 per month support.

Mrs. Jamison: (inaudible)

Counsel for plaintiff: She has indicated that she has turned over her W-2 forms and that they have budgeted her income. Her income is not the question. It's whether or not Mr. Jamison is living with her, and this is quite beyond—I brought it up solely because Mrs. Frankel was seemingly trying to make a point of noncooperation which in fact did not exist.

Mrs. Frankel: Well, that's not quite the issue, we also wanted to know if she claimed Marne as a tax exemption, and we wondered if she—

Mrs. Jamison: I gave you that information.

Mrs. Frankel: We wondered if she knew that the father of the child, Mr. Brown, was also claiming Marne as a tax exemption.

Mrs. Jamison: That's his legal problem.

Mrs. Frankel: And we again wondered if—well, we would like to know, did you file a joint tax return with Lee Jamison for—

\* \* \*

Mrs. Jamison: There's no law that states, to my knowledge, that I have to answer that. I have given you more than enough information."

The County Department did not pursue the matter and the hearing was terminated. The hearing officer's "Finding of Fact" merely summarized certain portions of the evidence submitted; it made no actual finding of fact on whether plaintiff was residing with her husband or whether he was supporting her, and did not even mention the uncontroverted fact that the County Department had processed a nonsupport complaint against Mr. Jamison. The recommended decision of the hearing officer, which was approved by the IDPA, was that "in the matter of desertion, the Department considers that appellant has not submitted sufficient information needed to determine her continued eligibility for public aid."

On appeal, the State contends that plaintiff's grant was not reduced upon a finding that plaintiff was living with, or receiving support from, her husband; rather it is asserted that plaintiff's individual aid grant was terminated because plaintiff refused to supply the County Department with information which was necessary to determine plaintiff's eligibility. The basis of the State's assertion is the following response of plaintiff to Mrs. Frankel's question of whether plaintiff had filed a joint tax return with her husband:

"There's no law that states, to my knowledge, that I have to answer that. I have given you more than enough information."

The State concludes that although plaintiff correctly asserted that no law required her to answer the question posed, the law is equally clear

that her refusal to do so justified the termination of her right to public aid.

■■ It is generally recognized that the acceptance of welfare benefits creates certain obligations, and that a recipient or applicant must comply with reasonable State welfare regulations intended to assist the State in determining eligibility. (*Wyman v. James*, 400 U.S. 309; *Fitzpatrick v. Illinois Department of Public Aid*, 52 Ill.2d 218, 287 N.E.2d 666.) By regulation, the IDPA has specifically authorized the denial or termination of public assistance for an applicant's or recipient's refusal to provide information essential to a determination of eligibility. The Illinois Department of Public Aid Categorical Assistance Manual, ch. 4003.2, par. 7, provides:

> "In considering those eligibility factors for which the statement of the applicant or recipient may be considered acceptable evidence, the case record is to show the reason for requiring further evidence.

> Whenever there is reason to question a statement of the applicant or recipient about an eligibility factor or when available information is inconclusive, the need to resolve the question is to be explained and additional sources of information are to be discussed with him. If the individual is unable to provide the information required to conclusively determine eligibility and is reluctant to permit the agency to obtain verification, it must be made clear to him that this may result in a denial or termination of assistance. His reasons should be explored with him to prevent him from unnecessarily or unwisely withdrawing or to assist in ascertaining whether previously presented information was accurate.

> If eligibility cannot be conclusively determined because of the individual's inability or unwillingness to provide essential information or to consent to verification by the agency, the application shall be denied or assistance terminated."

The foregoing regulation makes clear that assistance will not be denied or terminated unless certain requisites are met and certain procedures are followed. It is required that the information sought be "essential" to a determination of eligibility. When such information is not provided, it "must" be made clear to the applicant or recipient that a failure to provide such information will result in a denial or termination of assistance. Furthermore, there "should" be some discussion with the applicant or recipient on his reasons for failing to provide the requested information, and thereby, possibly clarify or correct any misunderstandings or misjudgment entertained by the applicant or recipient. With these principles in mind, and under the circumstances of the instant case, we can only

conclude that the Department failed to comply with either the letter or the spirit of its own regulation.

The written notification informing plaintiff of the prospective termination of her individual grant raised two items of noncooperation: (1) plaintiff had not given the County Department permission to contact the University which she attended on a scholarship; and (2) plaintiff had refused to produce a copy of her 1971 income tax return. Subsequent to the receipt of the notification, plaintiff supplied additional information on her school attendance, and submitted her W-2 statements in lieu of her income tax return. Mrs. Frankel, early in the hearing, stated that as of May 9, 1972, the time at which the additional information was supplied, plaintiff had been cooperative, and that the only two issues were the college scholarship and Mr. Jamison's alleged desertion and nonsupport. As the hearing continued, the evidence was addressed to the merits of the controversy. It was not until the end of the hearing that the colloquy concerning the Federal income tax return occurred. No admonition was given to plaintiff that her failure to answer the question would result in a termination of her benefits, nor were the reasons for her refusal explored. After plaintiff's response, which apparently reflected her notion that her tax return was privileged, the matter was completely dropped.

██ In our opinion, the procedure followed in this case was not within the contemplation of the Department's own regulation. We would initially note that the State has made no attempt to demonstrate the materiality and relevancy of the income tax return to the issues of desertion and nonsupport. Granting, *arguendo*, that plaintiff had filed a joint tax return in 1971, we fail to see the conclusive or "essential" nature of that fact to the issues presented. More importantly, however, even assuming the probative value of the information sought, is the Department's failure to admonish plaintiff of the consequences of her refusal. It is with good reason that the regulation explicitly requires as much; for absent the admonishment, an applicant or recipient may refuse the giving of information upon the good faith belief that the Department is not entitled to its disclosure. When the admonishment is given, the applicant or recipient at least has the opportunity to intelligently weigh the strength of his belief against its immediate consequence. This is particularly true when, as here, the record reveals that the parties perceived the administrative hearing to be an adjudication on the merits. Mrs. Frankel indicated that noncooperation was not at issue in the proceedings. Indeed, the matter of the 1971 income tax return was initially and gratuitously raised by plaintiff's attorney who stated that plaintiff had submitted all of her W-2 statements to the Department. Under these circumstances, the failure to adequately inform plaintiff of the consequence of her refusal

was erroneous. Accordingly, the judgment of the circuit court affirming the administrative decision is reversed and remanded.

■■ Since the matter is remanded and a hearing on the merits may result, we deem one further comment appropriate. On contested issues the hearing officer, over objection, allowed into evidence various hearsay statements of plaintiff's building managers. Although section 11—8.4 of the Public Aid Code (Ill. Rev. Stat. 1973, ch. 23, par. 11—8.4), provides that the "Illinois Department * * * shall not be bound by common law or statutory rules of evidence, or by technical or formal rules of procedure," the legislature did not intend by that section to abrogate the fundamental rules of evidence. (See *Novicki v. Department of Finance*, 373 Ill. 342, 26 N.E.2d 130.) The rule against hearsay is basic and fundamental, and not merely a technical rule of evidence (*Russell v. License Appeal Com.*, 133 Ill.App.2d 594, 273 N.E.2d 650); furthermore, due process requires that a recipient be given an opportunity to confront and cross-examine the witnesses relied upon by the Department. *Goldberg v. Kelly*, 397 U.S. 254; see *Rios v. Hackney* (N.D. Tex. 1967), 294 F.Supp. 885.

The judgment of the circuit court of Cook County is reversed and remanded in accordance with the views herein expressed.

Reversed and remanded.

DOWNING, P. J., and LEIGHTON, J., concur.