**Joan REYES, Janet Coon, Kathleen Jones, and Ivetta Bentson, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**James EDMUNDS, Individually and in his official capacity as Director of the Ramsey County Welfare Department, William Zuber, Individually and in his official capacity as Manager of the Legal Resources Service of the Ramsey County Welfare Department, Kay Dunkelberger, Individually and in her official capacity as Supervisor of the Ramsey County Welfare Department Fraud Unit, Harry Gregg, Individually and in his official capacity as Assistant Ramsey County Attorney, Thomas Keena, Individually, and in his official capacity as an Investigator for the Ramsey County Welfare Department Fraud Unit, Linda Browning, Individually and in her official capacity as an Investigator for the Ramsey County Welfare Department Fraud Unit, Vera Likens, Individually and in her official capacity as Commissioner of the Minnesota Department of Public Welfare, Eugene F. Macaulay, Individually and in his official capacity as Ramsey County Administrator, Defendants.**

Civ. No. 3–76–155.

United States District Court,
D. Minnesota,
Third Division.

July 17, 1979.

Paul Onkka, Jr., Legal Assistance of Ramsey County, St. Paul, Minn., for plaintiffs.

Darrell C. Hill, Asst. Ramsey County Atty., St. Paul, Minn., for defendants.

Robert Beutel, New Brighton, Minn., for amicus curiae American Civil Liberties Union.

## MEMORANDUM AND ORDER

DEVITT, Chief Judge.

This case is before the court from a recommendation by the Honorable Magistrate Patrick J. McNulty. Magistrate McNulty, with the consent of the parties, received extensive evidence and issued a thorough Memorandum Decision detailing his recommended findings and conclusions. Because of the excellent quality of that Memorandum Decision, it is set forth in full below. It reads as follows:

At Duluth, in said District, this 24th day of April 1979.

The above-entitled case came on for trial before the undersigned United States Magistrate on December 11, 1979, pursuant to special assignment, and stipulation of the parties, per Title 28 U.S.C. § 636(b)(2) and Local Rule No. 19. Plaintiffs appeared by Paul Onkka, Esq., defendants appeared by Darrell Hill, Esq., and the American Civil Liberties Union appeared amicus curiae by Robert Beutel, Esq.

Testimony was taken, other evidence received, and all counsel have now submitted Memoranda in lieu of comprehensive oral argument.

NOW, upon all of the file, record, and proceedings had, the following Memorandum Decision and Recommendation, incorporating Findings of Fact and Conclusions of Law, is made and entered and is deemed to be in compliance with the United States Code, Federal Rules of Civil Procedure, and all Local Rules.

### I.

This action is brought by four public assistance recipients residing in Ramsey County, individually and on behalf of others similarly situated, seeking declaratory, injunctive, and monetary relief. The defendants are employees and officials of either Ramsey County or the Department of Public Welfare of the State of Minnesota. Plaintiffs' action is premised upon alleged violations of the Fourth Amendment to the United States Constitution, the Social Security Act, and the Minnesota Privacy Act, *Sec. 15.162, et seq., Minnesota Statutes.*

On July 27, 1976, this Court, upon motion, issued an order which:

1. Dismissed the action against Eugene Macauley, former Ramsey County Administrator.

2. Dismissed the cause of action based upon the Minnesota Statute.

3. Granted summary judgment to all defendants on the cause of action based upon alleged violations of the Social Security Act.

On November 20, 1978, by stipulation, the action against Vera J. Likens, Commissioner of the Minnesota Department of Public Welfare, was dismissed.

The trial, therefore, proceeded solely upon the allegations that the remaining defendants, employees and officers of Ramsey County, have violated each of the plaintiffs' rights to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment. The plaintiffs standing to assert constitutional issues was previously established by a determination of this Court contained in an Order dated January 5, 1977.

This case has not been certified as a class action.

### II.

This action concerns the activities of the Mobile Unit of the Welfare Fraud Unit of the Ramsey County Welfare Department during the Spring of 1976. Defendant Dunkelberger is Supervisor of the Welfare Fraud Unit and, where relevant here, this Unit was composed of defendants Keena, Browning and Crow. The impetus for the formation of this Unit was provided by defendant Dunkelberger in early 1976. It was formed as a vehicle through which investigation of welfare fraud complaints could be expedited. At that time, the Department was receiving approximately 150 such complaints per month, and was faced with a backlog of approximately 1500. The Mobile Unit was assigned complaints which, after a perfunctory screening, did not appear to the Supervisor to be so flagrant as to justify immediate in-depth criminal investigation or other proceedings. The procedure which the Mobile Unit was to follow in its investigation is set forth in a Memorandum from Dunkelberger to the Executive Director of the Welfare Department dated February 20, 1976. Where relevant here, that Memorandum contains the following:

"The Mobile Unit usually consisting of Linda Browning and Tom Keena then take a large number of complaints (about 10 per day) and go into the field and go to the client's home. They ask a client for permission to come in and advise the

client that a complaint has been received by the Fraud Unit alleging that [whatever it is]. They then ask for the client's permission to look around her home to ascertain the validity of the complaint. They advise the client that she does not have to allow them to look around, but that it would be the best way to determine the situation. If the client refuses to allow them in, to look around, they advise the client that her welfare benefits can be terminated by her refusal, but that it is her option. If the client still refuses, they leave and they terminate the grant.

If the client allows them to look around, they will look in closets for men's or other person's clothing; in medicine closets for men's shaving equipment, etc. . . .

\* \* \* \* \* \*

I feel the above procedure is backed by the United States Supreme Court Decision, *Wyman versus [v.] James* [400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408]. I have discussed this case and our procedure with Mr. Gregg of the Ramsey County Attorney's office. As far as I know, he is aware of what we are doing and he has not advised me that we are acting contrary to law or violating any of the client's rights.

\* \* \* \* \* \*

The client is fully within her right to refuse a home visit, but the consequences of the refusal to permit a home visit is a termination of benefits. The choice is entirely the client's."

This Memorandum was the only written policy statement governing the procedure to be followed by the Mobile Unit. This policy was discussed with the fraud investigators assigned to the Mobile Unit on many occasions, and they were aware of its provisions.

Both Browning and Keena testified as to their "usual" procedure during the surprise visits, and, in some respects, it is not identical with the procedure set forth in this Memorandum. The testimony by the fraud investigators reflected an innocuous, almost subservient, approach and a mild request to search the premises. They testified that they neither informed a recipient of her right to refuse to permit a search, or of the repercussions if permission was not granted, until after their initial request for permission to search was denied. In those cases, they then informed the recipient that her persistence in refusing to allow them to search the home would result in grant action. There is no testimony regarding the number of consents which were obtained only after this information was given the client. The investigators admit that this statement of prospective action would be readily understood by any welfare recipient to mean a termination or reduction in the amount of the welfare grant. They also admit that their policy was to recommend a termination of the grant for a recipient who denied them permission to search her home, and that the policy of the Welfare Department was to terminate a grant upon this recommendation. Only in a small number of cases was the welfare recipient uncooperative, and grant action (presumably termination) was taken in 100% of those cases.

### III.

■■■ The Fourth Amendment is primarily a safeguard of the security of citizens against arbitrary invasion of their privacy by public officials. *See, Camara v. Municipal Court (1967) 387 U.S. 523, 87 S.Ct. 1727, 8 L.Ed.2d 930; Wolf v. Colorado (1949) 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782.* It affords protection of a personal right against any *unreasonable* infringement. *Katz v. United States (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.* The protection extends to intrusions during civil as well as criminal investigations. *Marshall v. Barlow's, Inc. (1978) 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305.* By the Fourteenth Amendment, this protection is afforded against state as well as federal action. *Ker v. California (1963) 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726; Mapp v. Ohio (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Elkins v. United States (1960) 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.* Historically, a search of private property

without a search warrant, issued by an independent judicial officer upon probable cause, has been considered unreasonable per se, *Stoner v. California (1964) 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; United States v. Jeffers (1951) 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; Johnson v. United States (1947) 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436,* subject to a few well established and clearly delineated exceptions. One of these exceptions is a search conducted with prior consent of the individual. *Davis v. United States (1945) 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Zap v. United States (1945) 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477.* Such consent has been termed a "waiver" of the constitutional right. It is not, however, a true waiver. It probably merely has the effect of negating the element of unreasonableness which is contained in the constitutional proscription. This may account for the difference in approach used to determine the efficacy of a consent to search from the general test utilized to determine the validity of a waiver of constitutional rights in the criminal trial context. The general test in the latter situations is that a waiver of a constitutional right must be a free, voluntary, intelligent, and intentional relinquishment or abandonment of a known right or privilege. *See, Johnson v. Zerbst (1938) 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Johnson v. United States, supra; Bumper v. North Carolina (1968) 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Miranda v. Arizona (1965) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Wren v. United States (10th C.A. 1965) 352 F.2d 617, cert. den. (1965) 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542.* The government is impressed with the burden of proving the acceptable nature of such waiver by the federal standard of clear · and convincing evidence. *Coolidge v. New Hampshire (1971) 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; Bumper v. North Carolina, supra; Wren v. United States, supra.* Bowing to a demand of authorities, or to force or coercion, or an action taken without knowledge that a right to forego that action exists, cannot constitute a waiver of a constitutional right under this criteria. The burden of proof is

eased, however, and the concept of a waiver altered, in Fourth Amendment cases. The subjective element, that is, the individual's personal knowledge of the constitutional right and the concomitant privilege to refuse to consent to a search, is removed from the generally applied test. The government agent need not inform the person of this right, nor prove that it was knowingly abandoned, to validate a waiver of the search and seizure immunity. As a matter of logic, it is difficult to perceive of how someone can intentionally waive something of which he has no knowledge, but, in an attempt to preserve individual rights without totally compromising effective law enforcement, the Court has taken the position that the Fourth Amendment is not an "adjunct to the ascertainment of truth." The protections and rights afforded thereunder, therefore, are of a lesser degree, and of a different order, than those afforded by other provisions of the Bill of Rights. A consent to a search is a "waiver" of a constitutional right only in a very broad sense. The knowledge of the right to refuse to consent to a search is only one factor for consideration and does not stand alone as the *sine qua non* of an effective consent to search. *Schneckloth v. Bustamonte (1972) 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.* To test the effect of such consent the Court must judge it against the totality of all of the circumstances. The question asked is, was it essentially a voluntary, free, and unconstrained choice or was it the result of duress or coercion, implicit or explicit, or threat, express or implied, or of covert force. The voluntary nature of the consent, therefore, becomes a question of fact, not of law.

### IV.

■ At this time, the definitive word on the latitude which circumscribes the authority of "in home" visits of welfare recipients by the officials administering the programs is *Wyman v. James (1970) 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408.* In spite of defendants' denial during trial of any reliance upon this case, it is obvious that the Ram-

sey County Welfare Department Fraud Unit inaugurated the Mobile Unit on the basis of Dunkelberger's interpretation of this case. Reference to its teaching becomes relevant, and a comparison of the Ramsey County procedure with the facts of that case becomes somewhat determinative. In that case, a New York statute mandating home visits to maintain contact with persons receiving public aid to, among other things, determine eligibility to receive public aid, which provided that refusal of in-home visits was a ground for denial, suspension or discontinuance of assistance, was under attack. The plaintiff, upon notification that a case worker would visit her home on a certain day, had notified the Welfare Department that she would voluntarily supply reasonable and relevant information regarding her need for public assistance, but that she would not permit a home visit. After an administrative hearing, plaintiff's aid was terminated. Upon appeal, the Court, at the outset, made it clear that this case did not involve a Fourth Amendment question, as the statute did not contemplate a search within the purview of that amendment. It added that, even if it did, such entry into the home did not descend to the level of an unreasonable search. After observing that the purpose of the home visit was primarily rehabilitative and only secondarily investigative, the Court enumerated some of the reasons for this conclusion, which were:

1. The focus of the statute was upon the protection and aid of a dependent child and a mother's rights are secondary on a scale of comparative values.

2. The emphasis of the statute is upon assistance and rehabilitation and is concerned with the possible exploitation of a child.

3. The home visit affords personal rehabilitative orientation.

4. The home visit was pursuant to advance written notice. Privacy was emphasized. Forced entry, or entry under false pretenses, or snooping within the home was forbidden.

5. The plaintiff made no complaint of unreasonable intrusion into her effects, and no evidence supported an inference that the home visit was for the purpose of obtaining information of criminal activity.

6. The visit was by a trained case worker whose primary objective was the welfare of the recipient and not prosecution.

7. The home visit was not designed as an aid to any criminal prosecution.

The majority opinion in *Wyman v. James* is not without conceptual problems, and, in view of the vigorous, persuasive three-judge dissenting opinions, the holding must be restricted to the boundaries imposed by the facts to avoid glaring inconsistency with prior search and seizure cases. *See, e. g., Camara v. Municipal Court, supra.; See v. City of Seattle (1967) 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943.*

It is pertinent to view the Ramsey County program, in the abstract, against the facts and the principles established in that case. Several glaring fact distinctions are immediately noted, e.g.:

1. The Mobile Unit was organized solely to investigate complaints of welfare fraud. It was a part of the Fraud Unit of the Welfare Department. Its members were titled fraud investigators. They were not social workers. The focus of the Unit was not upon assistance or rehabilitation, nor with possible exploitation of a child, but upon law violations.

2. The Mobile Unit home visit was a surprise visit without advance written notice or arrangement. Snooping within the house was its primary purpose and the recipient's privacy was decimated.

3. The purpose of the visit was exclusively, solely, and undeniably for the purpose of obtaining information pertaining to welfare fraud, a criminal activity.

The Mobile Unit did not merely conduct a home interview pursuant to prearrangement. The Mobile Unit made a surprise visit with the avowed intention of conducting just the type of snooping which the Court found not present in *Wymen v. James*. The rehabilitative and assistive aspects of the welfare worker's obligation to

the recipient arose only peripheral and by accident. It was not the denial of an in-home interview which precipitated a termination of welfare benefits, but the withholding of a consent to investigative officers to invade dresser drawers, closets, medicine cabinets, etc. It was at the recipient's home to conduct a search directed towards discovery of infractions of the law. Whether or not the authorities later chose to prosecute for infractions is immaterial. The purpose of this Unit, as stated by the Supervisor, was solely to verify that the recipient was receiving a proper welfare grant. She also admitted that receipt of an improper welfare grant and welfare fraud could not be distinguished. This Unit was not engaged in social work, but in police work.

To justify the operation, the defendants seek to differentiate between a "social" search conducted by the Mobile Unit, and a "criminal" search, conducted for the purposes of obtaining evidence to be used in a criminal prosecution, on the basis of the quantum and nature of the investigation which would necessarily be conducted prior to obtaining a search warrant. The basis of this distinction seems to be a concern with admissability of evidence obtained without a search warrant. This distinction is much too subtle for this Court to grasp. In either case the search would be directed towards the discovery of facts which would establish that the recipient was improperly (illegally) obtaining welfare funds. Evidence obtained by the Mobile Unit would be inadmissable in a criminal action only if the search was made without valid consent. The defendants claim that this type consent was always obtained. Their policy and rationalization belie this position. If valid consent to search was always given, the evidence would always be admissable in a criminal action, and the distinction which defendants erect is nonexistent.

Only brief analysis of the nature of the consent to search which the Mobile Unit policy was designed to obtain is necessary to graphically illustrate the illegality of the procedure. There is no doubt from the testimony of the Supervisor that the recipient's grant would be terminated upon her refusal to allow the Mobile Unit to search her home, and that the fraud investigators were instructed to inform the recipient of this fact. There is some quibbling in this regard by the investigators who contend, probably correctly, that the Mobile Unit could only recommend and not actually effectuate a termination. The only inference which the Court can draw from all of the testimony is that such recommendations were always made and were routinely followed by the Welfare Department, and as a practical matter were tantamount to termination. Small wonder that there was some apprehension about the admissability of evidence obtained in this manner.

The precise testimony of the Supervisor was:

"Q. Let me ask you again, if you did have a policy of terminating benefits if an individual refused to allow a home visit?

A. Yes.

Q. Okay. Now do you recall whether there was any policy or practice within your unit of informing clients of the fact that if they did not allow a visit or a search that their grant would be terminated or reduced?

A. The investigators were to advise the client that they did not have to allow the search.

Q. That is not my question, obviously.

A. And that her failure to allow the search could result in grant termination.

Q. Okay. And isn't it also correct for the large percentage of the A. F. D. C. recipients in the Ramsey County that their grant was their sole or primary source of income for the support of their families and themselves?

A. I am not familiar with—I would presume that they are on welfare and that is their sole source of income. I am not aware. Many of them are employed.

Q. Now, as a practical matter, do you believe that by making a statement of a refusal to allow a search to result in the termination of benefits was one which made a consent to these kinds of searches and visits voluntary?

A. Yes."

Existence upon the largest of the taxpaying public may appear to some to be a way of life to a segment of society. This jaundiced view should not obscure the fact that, at best, it is a demeaning status by virtue of, among other things, being subject to bureaucratic autocracy. What greater inhibition to freedom can there be than that which a welfare recipient faces when subjected to a threat by the authorities to eliminate her sole means of providing food, shelter and clothing for her family? This is coercion in its purest form.

The Court in *Wyman v. James, supra.*, very carefully distinguished the facts in that case from the facts in *Camara v. Municipal Court, supra.*, and *See v. City of Seattle, supra.* It did this, without disturbing the previous holdings, by emphasizing that the latter two cases were concerned with a true search for law violations and that *Wyman* was not. *Wyman* did not even involve a search. In *Camara* and *See*, the Court had clearly held that a warrantless search conducted as part of a routine canvass to enforce compliance with a City Ordinance was unreasonable, and that the repose of the decision to enter and inspect private premises to the unreviewed discretion of an enforcement officer is inimical to constitutional standards. The distinction utilized in *Wyman* is inapposite on the facts now before this Court. The procedures condemned in *Camara* and in *See* are precisely mirrored in the Ramsey County plan. In essence, what the Ramsey County plan has attempted to do is to condition welfare benefits upon a surrender to the state of the sanctity of a man's castle. Even a loose reading of *Wyman v. James* does not extend that Court's holding to this extreme, and *Camara* and *See* militate against its perpetuation.

No one will contend that the duty and trust imposed upon the Welfare Department to assure that public funds are expended properly is not of great significance and fraught with practical difficulties. But the integrity of financial assistance programs must be preserved only by utilizing reasonable administrative procedures. Reasonableness is the ultimate standard. *Marshall v. Barlow's, Inc., supra.* This does not include a suspension of the Constitution.

"Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation [citation] or to denial of a tax exemption [citation] or . . . discharge from public employment." *Goldberg v. Kelly (1970) 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287.*

The Court used these words in a due process context, but they are also applicable here.

### V.

We must, however, also resolve the individual claims presented by each of the remaining plaintiffs in this case. The facts as hereinafter recited are findings of fact produced by this Court's resolution of conflicts in testimony. Where differences in testimony of factual occurrences are material, effort has been made to recite the versions which are contrary to the factual findings and to identify the witness so testifying.

### KATHLEEN MARIE JONES

■ This plaintiff was the recipient of AFDC assistance for four minor children residing with her in the City of St. Paul. Her sole source of sustenance was this grant. On March 25, 1976, fraud investigators Crow and Browning appeared at this plaintiff's home, without notice, about 4:20 p.m. They identified themselves as being from the Welfare Fraud Department and stated that they were investigating a complaint. The plaintiff invited them into her kitchen. In order for the investigators to reach the kitchen it was necessary for them to walk through other parts of her living quarters. While traversing this area of the home, the investigators observed a male

lying on a sofa in the living room. After they were seated at the kitchen table, the investigators informed Jones that they had received a report that she had a man living with her. The investigators questioned her in this regard, and then asked for her permission to search her living quarters. Plaintiff refused to consent to a search. The investigators informed her that if she persisted in this refusal her welfare grant and her food stamps would be cancelled. They further informed her that if she permitted the search and they thereafter felt that an unauthorized man was residing in her home that her grant would be reduced to a shared household basis. The investigators left without conducting further search of the residence. Thereafter, Miss Jones was notified that her food stamps were cancelled and her assistance reduced to that of a shared household. Upon appeal through administrative channels, this determination was reversed after a hearing at which one of the Mobile Unit fraud investigators testified concerning the May 25, 1976, visit. The reduction in this plaintiff's assistance, therefore, never became effective.

The testimony of the fraud investigators is virtually identical to that of Miss Jones except that they deny telling her that her welfare grant would be cancelled if she refused to allow them to conduct a search, and, instead, testified that they told her that her failure to cooperate might result in grant action. The difference in phraseology appears to be purely semantic and of little import. The fraud investigators did recommend that her grant be reduced and administrative action in this regard was taken.

This plaintiff suffered no monetary loss, but certainly suffered some inconvenience. Her emotional reaction was one of shock and she became upset and felt threatened and pressured to accede to the investigators' demands.

Defendants contend that because a concentrated search of Jones' personal effects was not conducted she cannot complain. This contention is without merit. The in-

vestigators' entry into the living quarters was accedence to a demand, express or implied, under the color of their office. The search commenced at the time that they stepped across the threshold. *Johnson v. United States (1948) 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Davis v. United States (1946) 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453.*

### IVETTA BENTSON

■ This plaintiff was the recipient of AFDC benefits for one minor child residing with her in the City of St. Paul. Plaintiff had received benefits commencing in 1970, and they were her sole source of support. On April 5, 1976, at about noon, investigators Browning and Keena appeared unannounced at her home. When she answered the door they identified themselves as members of the Ramsey County Fraud Unit and informed her that they had received some complaints and wished to check through her house. Plaintiff testified that at this time Keena flashed a badge. Both Keena and Browning were Ramsey County Deputy Sheriffs. This plaintiff had not yet arisen for the day, and asked that they return later. The investigators insisted upon immediate admittance and told her that if she refused she would not receive a check on the first. Plaintiff asked them to wait until she dressed, which she did, and she then admitted them. Plaintiff testified that she was not informed that she had a right to refuse to allow the search but that she felt that she had no choice in the matter if she wanted to continue to receive her welfare checks. After a brief conversation, she permitted them to search. The search included cupboards, closets, drawers, medicine cabinet, washer, dryer, etc., and some interrogation of plaintiff's minor child. Plaintiff testified that the investigators also opened mail which was in the apartment addressed to a third person. This the investigators deny. During the visit plaintiff was told that the complaint to which they were responding was that she was living with someone, and that she had been turned in for defrauding the Welfare Department.

The investigators testified that in addition to the complaint concerning a man residing with her they also informed the client that a couple of landlord statements were being questioned as fraudulent. They deny opening mail, although they admit observing it and the name of the addressee, and deny informing this plaintiff that if she refused to allow the search that her grant would be terminated.

This Court is persuaded that where there is a conflict in testimony on material fact that plaintiff's testimony is generally more credible. The Court cannot accept an allegation that these fraud investigators opened mail addressed to a third party, although admittedly they examined it, and the Court cannot accept as fact the proposition that plaintiff consented to this search without a reference to the fact that a refusal would at least interrupt the regular receipt of her welfare grant.

This plaintiff suffered no monetary loss but testified that the episode maddened her and, in effect, was humiliating.

This Court is compelled to make one further observation in regard to this episode for, admittedly, it is a factor which effects other conclusions. At the time of this visit the hour was near noon. In addition to Bentson's four year old daughter, there were two other children in the house, one age four and one younger. Bentson was still abed. Had even a secondary purpose of this home visit been to promote the welfare of the minor child certainly this situation should have raised some professional, or humane, concern. Yet the care of this child was never mentioned to the client, to the Department, or to the Court. Only if one accepts the proposition that the Mobile Unit is exclusively a policing force, and not engaged in social service, does this disinterest in the child's welfare make sense.

Under the circumstances present here, the Court finds as fact that the consent to search was the product of fear of the loss of the client's sole financial resource. That it was not a voluntary relinquishment of right, known or unknown, and that it was obtained by an abuse of authority.

## JANET COON

This plaintiff was the recipient of AFDC benefits for four minor children who resided with her in the City of St. Paul. This was her sole source of income. On March 4, 1976, Browning and Keena appeared at her home, unannounced, late in the forenoon. They identified themselves as being from the Ramsey County Welfare Department, and, upon being admitted into the home, informed her that they had received an anonymous tip that she was living with a man and that they wanted to look through her home. Plaintiff replied that she would rather that they did not and that they had no right to do so without a search warrant. The investigators then informed her that she had a right to refuse to allow them to search their home, but that unless they were granted permission her welfare grant would be taken away from her. Plaintiff relented, and a search of the house, including drawers, closets, and medicine cabinets was conducted. Thereafter, the investigators recommended a reduction in this plaintiff's welfare grant to reflect a shared household.

The investigators denied telling this plaintiff that a refusal to permit a search would result in her welfare grant being terminated. They testified that she readily granted permission to search her house so that it was therefore not necessary for them to inform her of her right to refuse or the action which they would take if she refused. The Court rejects this testimony and finds as fact the plaintiff's version of this portion of this episode.

Under all of the circumstances this Court finds that Coon's consent to a search of her home was the result of coercion and threat. The alternatives presented to her left no freedom of choice at all.

This plaintiff testified that during this visit she became very mad and upset with this invasion of her privacy.

## JOAN REYES

This plaintiff did not appear at trial and no evidence was introduced on her behalf.

On this claim, judgment for defendants must be entered.

## VI.

■ Harry Gregg, Assistant Ramsey County Attorney, has been named as a defendant herein, individually and in his official capacity. The evidence establishes that this defendant was informed of the formation of the Mobile Unit and of the procedures it would follow, and, whereas he did not tell anyone that it was contrary to law or in violation of a welfare client's rights, neither did he advise implementing the plan or in any way participate in its direction or supervision. There is no basis upon which to impose liability on this defendant for activities of the Mobile Unit. This defendant is entitled to judgment, or to dismissal of the action against him, with prejudice, for failure of proof.

## VII.

### DAMAGES

■ Title 42 U.S.C. § 1983 creates a statutory species of tort liability for the deprivation of rights, privileges and immunities secured by the Constitution. *Imbler v. Pachtman (1976) 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128.* As in all tort actions, the amount of damages awarded must be related to the injuries suffered. None of the plaintiffs have proven a pecuniary loss. They seek compensatory damages solely for mental or emotional distress. To justify an award of money damages on this basis, the emotional distress must be genuine, and must be proven by competent evidence. *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.* At best, placing an absolute dollar value on this element of damages is legal legerdemain. In this case, the response of the plaintiffs had numerous components—upset, shock, even humiliation; but primarily it was of anger. This does not appear to be a compensable emotional reaction.

■ However, plaintiffs are entitled to the recovery of damages for deprivation of constitutional rights from which no pecuniary or provable special damage has resulted. There is damage inherent in this wrongful act. *Hostrop v. Bd. of Jr. College Dist. No. 515 (7th C.A. 1975) 523 F.2d 569, cert. den: (1976) 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208.*

"Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights." *Carey v. Piphus (1978) 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252.*

The right to be free from unreasonable search and seizure is an absolute right. It in no way is qualified by whether or not evidence of an illegal activity is actually possessed or being concealed. A violation of this right is per se damaging. These plaintiffs are entitled to nominal damages.

Plaintiffs have made no demand for punitive or exemplary damages, and this issue need not be considered.

## VIII.

### ATTORNEYS FEES

■ The Complaint also seeks judgment for attorneys fees. An award of attorneys fees to a prevailing party in a civil rights case is permitted. *Lyle v. Teresi (Minn. 1971) 327 F.Supp. 683.* The amount thereof is determined by an exercise of sound equitable principles and learned discretion. Plaintiffs are represented by counsel provided by Legal Assistance of Ramsey County. In establishing the amount of a fee award, if any, in this instance, the Court must take cognizance of the ultimate recipient of that award. Neither this informa-

tion nor a statement of time, effort, etc., expended by plaintiffs' counsel has been submitted to the Court. Practice in the Fifth Division of the Court, in some cases, has been to allow the matter to be brought before the Court on a motion subsequent to determination of liability, but prior to entry of judgment. This practice has merit.

WHEREFORE, it is—

RECOMMENDED:

That this Court enter judgment as follows:

1. Certifying this action as a class action, pursuant to Rule 23, Federal Rules of Civil Procedure, making the members of the class all persons receiving AFDC grants from the County of Ramsey. (*See, Hoehle v. Likens (8th C.A. 1976) 538 F.2d 229.*)

2. Declaring that the policies adopted by the County of Ramsey in creating the Mobile Unit adjunct to the Fraud Unit of the Welfare Department and in establishing its procedure and practices are inconsistent with the Fourth Amendment to the Constitution of the United States.

3. Restraining and enjoining the named defendants, their successors in office, and all agents, subordinates or other persons acting in consort with them, from in any way reducing, terminating or jeopardizing the AFDC grant of any person solely because that recipient denies any agent of Ramsey County access to that recipient's living quarters for the purpose of a search thereof.

4. Granting judgment for defendant Harry Gregg.

5. Granting plaintiffs Kathleen Jones, Janet Coon, and Ivetta Bentson judgment against the remaining named defendants in the sum of One Dollar, each, together with costs and disbursements.

6. Granting defendants judgment against Joan Reyes.

7. Awarding to plaintiffs a suitable amount to compensate their counsel for services rendered herein upon proper motion and proof filed within ten days of the date hereof.

8. Denying plaintiffs all other and further relief for which they pray.

\* \* \* \* \* \*

Objection has been made to Magistrate McNulty's recommendations by plaintiffs, who assert that the recommendations are in error with respect to measure of damages. Plaintiffs argue that the recent case of *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), which requires proof of damages in § 1983 cases, only applies when procedural, as opposed to substantive, constitutional rights are violated. It is true that *Carey* did not address the issue whether damages could be presumed in cases involving violations of substantive constitutional rights, but it is equally true that the general reasoning in *Carey* applies to most § 1983 cases, including Fourth Amendment cases. This has been the general interpretation given by other courts to the *Carey* decision. *See Morrow v. Igleburger*, 584 F.2d 767, 769 (6th Cir. 1978) (illegal incarceration); *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978) (First Amendment rights); *Davis v. Village Park Realty Co.*, 578 F.2d 461, 463 (2d Cir. 1978) (First Amendment rights); *Atcherson v. Siebenmann*, 458 F.Supp. 526, 537 (S.D.Iowa 1978) (First Amendment); *Hernandez v. Lattimore*, 454 F.Supp. 763, 767 (S.D.N.Y.1978) (Eighth Amendment rights); *O'Brien v. Leidinger*, 452 F.Supp. 720, 727 (E.D.Va. 1978) (First Amendment and equal protection rights); *Boston v. Stanton*, 450 F.Supp. 1049, 1058 (W.D.Mo.1978) (Eighth Amendment and access to court rights). Consequently, the Magistrate's recommendation with respect to damages is consistent with *Carey* and with *Carey's* progeny.

Magistrate McNulty's recommended findings and conclusions, as detailed in his excellent Memorandum Decision, are adopted by this court.