Whitehead, J.
INTRODUCTION
The defendant stands indicted on a single charge of trafficking in one hundred grams or more of cocaine. He has moved to suppress physical evidence (the *571 cocaine itself) which was seized from an apartment in Lawrence on September 26, 1994. The Court conducted a hearing on the motion from September 11, 1995 through September 13, 1995. The following constitute the Court’s findings of fact, rulings of law and order on the motion.
FINDINGS OF FACT
On the evening of September 26, 1994, Lawrence Police Detectives Thomas Wolfendale and Brian Burokas proceeded to Osgood Street, in Lawrence, for the purpose of conducting a surveillance of the six-family dwelling located at 94-96 Osgood Street. It had been reported that narcotics-related activity was occurring at that address.
Upon their arrival, the detectives took up positions on the property of 98-100 Osgood Street, next door to 94-96 Osgood Street. Detective Wolfendale went to the front porch of the building. Detective Burokas secreted himself at ground level along the side of the building.
At sometime close to 9:00 p.m., an older model automobile pulled up across the street from 100 Osgood Street. A male individual exited the vehicle and walked up onto the porch where Detective Wolfendale had positioned himself. The male individual was carrying two bags, which he held against his chest. As he entered onto the porch, Detective Wolfendale said to him, “You must be looking for 94-96.” The male replied, “I know what I’m looking for. I’m looking for the guy on the third floor.” At about that time, Detective Burokas came onto the porch. He recognized the male as one Jeffrey Freedman, an individual with whom he. had had prior contact.
Detective Wolfendale identified himself as a police officer and exposed his gun holster, to which his badge was attached. He asked Freedman, “What’s in the bag?” Freedman replied, “A six-pack of beer.” One bag was partially open, and the lighting was reasonably good. Detective Wolfendale was able to observe a six-pack of beer in the bag. He asked, “What’s in the other bag?” Freedman replied, “A scale.” Detective Wolfendale asked Freedman to open the bag up. Freedman, in response, withdrew a black case from the second bag. Detective Wolfendale asked Freedman to open up the case. Freedman complied. At that point, Detective Wolfendale observed an item which he, an experienced narcotics investigator, recognized to be a “sophisticated scale,” capable of measuring items in units as low as grams and milligrams. He knew that similar scales are used in the narcotics trade.
Freedman recognized Detective Burokas and greeted him by his first name. A brief conversation ensued between them. Detective Wolfendale then asked Freedman why he was at 100 Osgood Street. Freedman replied that he was there to purchase some jewelry from a man named “Jose.” Freedman then entered the common hallway of the building. (It was apparently a multiple-family dwelling.) Detectives Wolfendale and Burokas entered as well.
Once inside the building, Detective Wolfendale said to Freedman, “I don’t believe you.” Freedman replied, “Why don’t you go upstairs and find out?” He then continued up the stairs to the third floor. Detectives Wolfendale and Burokas were immediately behind him. As the three men proceeded up the stairs, Detective Wolfendale told Freedman that he thought Freedman was lying. He stated that he suspected Freedman was there to buy something else. At that point, Freedman acknowledged that he was there to buy cocaine.
As Freedman arrived at the third-floor landing, Detectives Wolfendale and Burokas stopped. They remained a few steps down on the staircase. However, they were able to observe what Freedman was doing on the landing. Freedman knocked on the door of the third-floor apartment. A male voice from within asked, “Who is it?” Freedman replied, “It’s me.” The door opened, and a male occupant of the apartment asked, “Have you got the money?” At that point, Detective Wolfendale proceeded quickly up onto the third floor, past Freedman and into the apartment. He announced that he was a police officer. Detective Burokas also proceeded up to the third-floor landing and stood behind Freedman in the doorway of the apartment. No weapons were produced. The male occupant of the apartment asked, “Are you kidding?” Detective Wolfendale replied, “No.” At that point, Detective Burokas escorted Freedman into the apartment and closed the door.
Inside the apartment when the detectives first entered were the defendant, Jose Garcia; one Grisel Figueroa; and Ms. Figueroa’s four children, aged 11 years, 5 years, 4 years and an infant. The apartment consisted- of several rooms. The door through which the detectives entered opened into a parlor. To the right was a bedroom. To the left was a kitchen, off of which ran a hallway to two additional bedrooms and a bathroom. When the detectives entered the apartment, Mr. Garcia, Ms. Figueroa, the 4-year-old child (Kimberly) and the infant were in the parlor. The other two children were in one of the back bedrooms.
The apartment was rented to Ms. Figueroa, who normally occupied it with her children. Her bedroom was the bedroom to the right of the parlor. Mr. Garcia was not a permanent occupant of the apartment. However, he was the father of the two youngest children and would stay in the apartment when he was in Lawrence. On those occasions when he stayed, he was not provided with a key to the apartment. (The door was sometimes locked.) However, while inside of the apartment, he had unrestricted access to all of its rooms and was welcome to have guests visit. On the very evening of September 26, 1994, he had arrived from New York. He had entered the apartment approximately one hour before the detectives appeared. He had left his jacket in Ms. Figueroa’s bedroom, used the *572 bathroom and the telephone, and then sat in the parlor with Ms. Figueroa.
The first question which the detectives put to the occupants, once they had entered, was, “Who rents the apartment?” Ms. Figueroa replied that she did. Detective Wolfendale told her that the police were there because Freedman had told them that he had come to buy cocaine. Detective Wolfendale then asked if he could look around the apartment. Figueroa asked, “Why?” Detective Wolfendale repeated that Freedman had said that he had come to buy cocaine.
Detective Burokas decided to talk privately with Ms. Figueroa. To that end, he asked her to accompany him into the kitchen. She complied, bringing the infant and 4-year-old with her. Detective Wolfendale, Mr. Garcia and Freedman remained in the parlor. Once in the kitchen, Detective Burokas asked Ms. Figueroa again if the detectives could search the apartment. Again, she asked, “Why?” Detective Burokas told her that the detectives wanted to look around because Freedman had said that he had come to the house to buy drugs from Jose. At that point, one of the detectives told Ms. Figueroa that she had two choices; either she could consent to the search or the detectives would “get” a search warrant. He told Ms. Figueroa that if she elected the option of a search warrant, a police officer would remain on the premises while the warrant was being secured. He further told her that if the police were forced to obtain a warrant and if cocaine was discovered during the search undertaken pursuant to the warrant, the Department of Social Services (DSS) would be called, and DSS “could” take her children from her. The detectives either implied or expressly stated that DSS would not be implicated if she consented to a search.
During the conversation between Ms. Figueroa and Detective Burokas, Ms. Figueroa’s two older children awoke and came into the kitchen. She told them to return to their bedroom, and they did. Mr. Garcia attempted to enter the kitchen as well. However, this caused the 4 year-old to become agitated, and Detective Burokas pushed Mr. Garcia back into the parlor. Detective Wolfendale then told Mr. Garcia, “Sit down and don’t move.”
Ms. Figueroa told Detective Burokas that Mr. Garcia had just arrived from New York, that he was the father of two of her-children and that he had only been in the apartment for an hour. Detective Burokas asked her which room Mr. Garcia had entered. She replied that Mr. Garcia had been in her bedroom and the bathroom. Detective Burokas then asked her again for permission to search the apartment. He stated that the search would be limited to those two rooms. At approximately that time, Mr. Garcia, who was still in the parlor, stated, “Go ahead and search. I have nothing to hide. It’s not my apartment.” Ms. Figueroa then said to Detective Burokas, “Go ahead.”
Detective Burokas asked Ms. Figueroa to put her consent into writing. In response, Ms. Figueroa produced a pen and a piece of paper. Detective Burokas instructed her as to how to word the consent. He also had her reduce to writing her account of why Mr. Garcia was in the apartment. The written consent comprises Exhibit No. 1.
Although the written consent contains no limitation as to the scope of the search to be conducted, the detectives, in fact, confined the search, as orally agreed, to the bathroom and Ms. Figueroa’s bedroom. Ms. Figueroa, Mr. Garcia, Freedman and a uniformed police officer, who had just arrived, remained in the parlor. While searching a pocketbook which was hung on the back of the bedroom door, Detective Wolfendale found and seized the cocaine which is the object of this motion.
The Court finds the following additional facts with respect to the search. At the time that the detectives first entered the apartment, they had determined that, in fact, they would conduct a search, either with the consent of the occupants or pursuant to a search warrant. They were in the apartment a period of minutes (the Court cannot be exact as to how many minutes) before they secured Ms. Figueroa’s consent to search. The tone of the detectives while addressing Ms. Figueroa was conversational but firm. During the time that Ms. Figueroa and Detective Burokas spoke in the kitchen, both remained standing. Detective Burokas is of average height. Although he is stocky in build, he is not physically imposing. Detective Wolfendale is taller, but of slighter build. He also is not physically imposing. Ms. Figueroa is of average height and build.
Ms. Figueroa remained composed throughout the period that the detectives were in the apartment, up until the time that the cocaine was found. However, at that point, she appeared shaken. As she, herself, testified, she had not been aware that cocaine was in the apartment until it was discovered by the detectives.
Why did Ms. Figueroa consent to the search? The police were in the house. It was clear that they would not leave until they had conducted a search, either with her consent or pursuant to a search warrant. If she consented, the incident would be over quickly. If she required a warrant, an officer would be posted inside the apartment until the warrant was obtained. She did not think that there was cocaine in the house. Her thinking was reinforced when Mr. Garcia, himself, saying that he had “nothing to hide,” invited the police to search. By agreeing to a search which was limited in scope to the bathroom and the bedroom, she could promptly put an end to the police presence, while at the same time minimizing the intrusion upon the privacy of her family.
Was Ms. Figueroa influenced by the detectives’ reference to DSS intervention? No. Taking the reference to DSS at its worst, it consisted of a threat by the detectives to summon DSS only if they were required to obtain a search warrant and if cocaine was found. Ms. Figueroa did not believe that there was cocaine in the apartment. Hence the threat was a empty one from *573 her perspective. Of course, even mention of the possibility that one’s children might be taken away can be jolting. However, the reference to that possibility in this case did not move Ms. Figueroa to give consent to search. Even after DSS was mentioned, she continued to withhold consent until she had eventually bargained for a limitation on the scope of the search.
Ultimately Ms. Figueroa gave consent to search because she concluded that to do so was in her best interests, based upon accurate information which the detectives had provided to her and based upon her own personal knowledge and belief concerning the status of the apartment and its occupants. As it turned out, her conclusion was wrong, not because of any misrepresentation by the police but rather because of her erroneous belief that a search would yield nothing.
RULINGS OF LAW
The defendant contends that the “stop” of Freedman by Detectives Wolfendale and Burokas on the front porch of 98-100 Osgood Street and the inspection of his bags were unlawful. Based on that premise, he further argues that, to the extent that the information which the police acquired during the stop otherwise might have justified their .subsequent actions, such information must be discounted by the Court. The Court has doubt as to whether the actions undertaken by Detectives Wolfendale and Burokas, in fact, constituted a stop. It does not appear that the detectives, restricted Freedman’s movement at any time. They merely engaged him in conversation. The fact that they identified themselves did not, in and of itself, convert their actions into a form of detention. See generally Commonwealth v. Pimentel, 27 Mass.App. 557, 560 (1989) (not every encounter between a police officer and a private citizen constitutes a stop); Commonwealth v. Borges, 395 Mass. 788, 791 (1985), quoting, United States v. Mendenhall, 446 U.S. 544, 554 (1980) (a stop is defined by an objective standard, to wit: whether “a reasonable person would have believed that he was free to leave”).
In any event, even if there was a stop, the defendant does not have authority to contest its validity. His rights are not implicated by actions which the police took vis-a-vis Freedman. See generally Commonwealth v. King, 359 Mass. 233, 240 (1983) (“in order to have standing to contend that a search violates a constitutionally protected interest, the defendant must show a violation of his constitutional rights and not those of another”). Moreover, because the defendant is not charged with a possessory offense based upon any items which were recovered from Freedman during the “stop,” this is not a case warranting application of the “automatic standing" rule. See generally Commonwealth v. Amendola, 406 Mass. 592, 597-599 (1990). Accordingly, in its determination of the validity of the detectives’ subsequent actions, the Court properly may consider the information which the detectives acquired from Freedman outside of Ms. Figueroa’s apartment.
The information which the police acquired prior to entering Ms. Figueroa’s apartment, including the information obtained from Freedman, clearly gave them probable cause to believe that narcotics were located inside of the apartment. Freedman had said that he had come to buy cocaine from an occupant of the apartment known to him as “Jose.” See generally Commonwealth v. Parapar, 404 Mass. 319, 322-325 (1989), quoting, Uniled States v. Harris, 403 U.S. 573, 585 (1971) (“People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility — sufficient to at least support a finding of probable cause to search”). Moreover, this declaration against penal interest was corroborated by the fact that Freedman was canying a scale similar in type to those used by individuals in the narcotics trade. It was further corroborated by the fact that a male occupant opened the door and asked of Freedman, “Have you got the money?” At that point, there was certainly a reasonable likelihood that the cocaine to be purchased was somewhere inside of the apartment.
Moreover, there were reasonable grounds to believe that if the detectives did not take some form of action to secure the apartment, the cocaine would be removed or destroyed. Freedman had not been arrested as he proceeded up the stairs. He knew of the detectives’ presence and the fact that they now suspected cocaine to be in the apartment. It was only logical to infer that he wold inform “Jose” of those circumstances and that “Jose" would take immediate action to avoid being incriminated. Given the situation which confronted them, it was lawful for the detectives to enter the apartment uninvited and to secure its contents until such time as they obtained lawful authority, by way of a search warrant or the owner’s consent, to search. See generally Commonwealth v. Blake, 413 Mass. 823, 829 (1992), citing Segura v. United States, 468 U.S. 796, 810 (1984) (“securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents”).
Ultimately, the detectives’ authority to search consisted of the consent which was given by Ms. Figueroa, the person in control of the apartment. Of course, such consent was not valid unless given voluntarily. See, e.g., Schneckloth v. Bustamante, 412 U.S. 218 (1973), and its progeny. Moreover, the burden is on the Commonwealth to prove the voluntariness of the consent. Id. at 248. However, the Court concludes that the Commonwealth has met its burden in this case. It is true that, to some degree, Ms. Figueroa was presented with a fait accomplis, in that the detectives had already entered the house and had expressed an intention to obtain a search warrant if consent was not given. Compare Bumper v. North Carolina, 391 U.S. 573 *574 (1968) (statement by police that they already possessed a warrant vitiated voluntariness of consent to search). But see Commonwealth v. Harmond, 376 Mass. 557, 561 (1978) citing Commonwealth v. Deeran, 364 Mass. 193, 196 (1973); Commonwealth v. Mendes, 361 Mass. 507, 512-13 (1972) (“[I]t is inconclusive on the question of voluntariness that the police announced their intention to seek a search warrant if consent were not forthcoming”). It is also true that Ms. Figueroa had (at least impliedly) been threatened with losing her children if she insisted on a warrant and if cocaine was found during a search executed pursuant to the warrant. Compare, Perez v. Edmunds, 472 F.Supp. 1218 (D.Minn., 1979) (consent invalid where welfare recipient told benefits would be terminated unless consent given). Lastly, it is true that she was aware of the fact that a search undertaken pursuant to a warrant would require an extended police presence in the apartment while a warrant was obtained; whereas a search undertaken pursuant to her consent would conclude quickly.
However, the voluntariness of a consent to search must be determined in light of all of the circumstances. E.g., Commonwealth v. Berry, 420 Mass. 95, 104 (1995). In that regard, the detectives’ presence on the premises was, although intrusive, lawful. It was a fact that they, indeed, would seek a search warrant if consent was not given. It was also a fact that it would take longer to obtain a warrant than it would to search pursuant to consent. Thus, the detectives merely confronted Ms. Figueroa with reality when they apprised her of the alternatives and requested her consent.
The threat to summons DSS if Ms. Figueroa insisted on a search warrant and if cocaine was found pursuant to the warrant ordinarily might have served as a decisive factor in undermining the voluntariness of Ms. Figueroa’s consent. However, as the court has found, the threat was an empty one in Ms. Figueroa’s circumstances, because she did not believe that cocaine would be found. Hence, DSS would have no basis on which to take her children, whether or not she gave consent.
Ultimately, as the Court has found, Ms. Figueroa gave consent because, in Mr. Garcia’s words, there was “nothing to hide” and because giving consent to search was the most expedient way of returning the household to normal. She was aware of her legal options. She was not intimidated. She kept her wits about her. She even bargained to limit, to two rooms of the apartment, the scope of the consent which she did give. Her consent was voluntary and the product of a free and rational choice. The search of the apartment and the seizure of cocaine were lawful.
ORDER
It is hereby ORDERED that the defendant’s motion to suppress evidence be DENIED.